WALTER RASH, respondent below, *vs.* BENJAMIN B. ALLEN, complainant below.

HOWARD D. ROSS, respondent below, *vs.* CHARLES M. ALLMOND, complainant below.

*Certiorari—Nature of the Writ—Authority of Superior Court to Issue—May be Directed to Inferior Courts and Tribunals—Purpose of the Writ—Contested Election—Hearing by City Council—Jurisdiction—Meaning of the Words, "Final and Conclusive"—Construction—Language Used—Passage of Bills—Constitutional Provision Respecting Passage of Bills; Mandatory—Failure of Journals to show Compliance—Bill "Passed"—Journals as Evidence—Validity of Enactment—Review of Void Judgments on Certiorari.*

1. The writ of *certiorari* as known in this State was a common law writ, issued from a Superior Court, directed to one of inferior jurisdiction, commanding the latter to certify and return to the former the record in the particular case.

2. The authority of the Superior Court to issue the writ of *certiorari* is both constitutional and statutory; and the said Court has the authority to issue the writ, in any case in which it was proper at common law. (*Sec. 7, Chap. 92, Rev. Code* 698; *Art. 5, Sec. 3, Cons't.* (1831); *Sec. 15 Hall's Dig.* 182, also *Secs.* 2 and 3, *ibid* 104; and *Art. 4, Sec. 7, Cons't.* (1897).

3. The Superior Court has authority to issue a writ of *certiorari* to The Council of the City of Wilmington for the purpose of ascertaining whether The Council had jurisdiction to hear and determine a contested election case heard by it under, *Sec. 27, Chap.* 727, *Vol.* 19.

4. The Superior Court will, when an appeal, or some specific mode of review is not given, examine, on *certiorari*, the proceedings of municipal corporations, though there be no statute giving this remedy; and will reverse or annul the proceedings, if it be found that they have exceeded, or not pursued, or not conformed to the requirements of their charter powers.
(*Murphy vs. City of Wilmington,* 6 *Houst.* 108; but *Reed vs. Hidman,* 4 *Harr.* 478, was held to be inapplicable.)

Syllabus.

5.   Under *Sec.* 27, *Chap.* 727, *Vol.* 19, providing for city elections in Wilmington, the City Council is clothed with authority to hear election contests, and their decision is made final and conclusive.   The words "final and conclusive" were construed to mean that the action and decision of The Council shall not be reviewable so far as the merits are concerned, but not to mean that their proceedings and determination might not be reviewed to the extent of ascertaining whether Council had jurisdiction, or had acted in excess of its authority, or contrary to law.

(*State vs. City Council*, 3 *Harr.* 294, was held not to reach the question before the Court.)

6.   By *Sec.* 30, *Chap.* 727, *Vol.* 19, providing that City Council "shall be the judge of the election and returns and qualifications of its members, and of all members of the corporation," The Council is made a special tribunal to hear contests of the elections of its members and of city officers.   A contest of the election of a City Treasurer must be conducted in the same manner, etc., as the contest of the election of a member of Council.

7.   When the validity of an act is attacked as was *Chap.* 178, *Vol.* 24, because of the alleged failure of the legislature to observe in the passage of the act the constitutional requirement that "no bill   *   *   *   shall pass either House unless the final vote shall have been taken by yeas and nays, and the names of the members voting for and against the same shall be entered on the journal," etc., resort may and should be had to the journals.

8.   A statute, or constitutional provision should be read and understood according to the most natural and obvious import of the language used.

9.   The three provisions of the Constitution, "no bill   *   *   *   shall pass either House unless the final vote shall have been taken by yeas and nays, and the names of the members voting for and against the same shall be entered on the journal, nor without the concurrence of a majority of all the members elected to each House," are mandatory, and are to be understood the same as if the word "unless" was inserted between the words "and" and "the."

10.   The provision of the Constitution that "no bill   *   *   *   shall pass either House unless the final vote shall have been taken by yeas and nays and the names of the members voting for and against the same shall be entered on the journal" is mandatory and must be enforced; and if it clearly and affirmatively appears, from an inspection of the journals, that such provision has not been complied with in the passage of an act; or if the journals fail to show that such provision has been complied with, it is the duty of the Court to declare such act void.

11.   The constitutional requirement that a bill, when it shall have passed both Houses, shall, before it becomes a law, be presented to the Governor for approval, etc., *held,* by the word "passed" is meant passed in the manner prescribed by the Constitution; and, if the Governor does approve, his approval is not conclusive of the validity of the statute.

12.   The Court may and should take notice of the journals, so far as to determine whether the legislature, in the passage of an act, has done

Syllabus.

those things which the Constitution requires to be done and the journals to show. The Constitution as to such matters has made the journals the record evidence, ultimate and conclusive.

13. Where legislative journals, are held to be conclusive as to those matters, which the Constitution requires to be entered therein, nothing outside of the journal, and not constitutional in its character, can be used to contradict the journal.

14. If legislative journals, upon inspection, leave such a doubt as to the passage of an act as requires, or admits of explanation, then the presumption in favor of the enrolled bill is not rebutted, and it must be held valid.

15. The legislative journals *held* to show that Senate substitute bill for Senate bill, each numbered 142 and having a different title relating to the City of Wilmington, the substitute bill providing when city officers shall be elected and appointed, afterwards published as *Chapter* 178, *Volume* 24, was not constitutionally passed, and that an election held under the published act was void; and that the City Council had no authority to hear and determine any contested election cases growing out of such election.

16. It is a rule of law that although a judgment given without jurisdiction may be regarded as a nullity, and impeached collaterally, still the Court on *certiorari* will perform what is the main object of a *certiorari* —the keeping of inferior courts and tribunals within the compass of their powers; and will reverse judgments of such courts or tribunals when they have proceeded without jurisdiction, or if they have exceeded the limits of their authority.

17. Though a party has a right to treat the proceedings of an inferior tribunal as nullities in a collateral proceeding, he may nevertheless maintain a *certiorari* to set them aside.

Cited, Del. Const. (1831), *Art.* 2, *Sec.* 8; *Art.* 5, *Sec.* 3; and *Const.* (1897) *Art.* 2, *Sec.* 10; *Art.* 4, *Sec.* 12, *par.* 5; and *Art.* 4, *Sec.* 7.

Cited, Del. statutes: *Sec.* 27, *Chap.* 727, *Vol.* 19; *Sec.* 30, *Chap.* 207, *Vol.* 17 *as amended, Vol.* 18; *Chap.* 178, *Vol.* 24, *amending Chap.* 177, *Vol.* 24; *Secs.* 3 *and* 4, *Chap.* 177, *Vol.* 24, *amending Secs.* 29 *and* 32, *Chap.* 207, *Vol.* 17; *Sec.* 2, *Chap.* 35, *Vol.* 17; *Sec.* 7, *Chap.* 92, *Rev. Code* 698; *Secs.* 2, 3 *and* 15, *Hall's Dig.,* 104 *and* 182; *and Sec.* 30, *Wil. City Charter.*

1 *Woolley, Del. Prac., Sec.* 897, *par.* 625.

(*June* 7, 1910.)

PENNEWILL, C. J., and BOYCE, CONRAD, WOOLLEY and HASTINGS, Associate Judges, sitting as a Court in Banc in New Castle County.

*Philip Q. Churchman, Robert H. Richards, Philip L. Garrett, Harry P. Joslyn* and *Frank L. Speakman* for plaintiffs in *certiorari.*

*J. Harvey Whiteman* and *Thomas F. Bayard* for respondents.

CERTIORARI to The Council of Wilmington.

Writs of *certiorari* were issued by the Superior Court for New Castle County in the above stated cases (being Nos. 71 and 72, respectively, to the September Term A. D. 1909), to "The Council" of The Mayor and Council of Wilmington, commanding the Council to certify to the said Superior Court (comprising Chief Justice Pennewill and Associate Judges Conrad and Woolley) true and complete records of their proceedings in said cases. Such records were duly returned to said Court. Thereupon, upon application of counsel that said cases be heard and determined by the Court in Banc—the counsel for the respective parties first agreeing that the two cases should be argued together, that the judgment of the Court should be entered in each case, and that the decision of the Court in Banc should be final,—the said cases were accordingly certified from said Superior Court to the Court in Banc, under *Section 15, Article 4 of the Constitution of Delaware,* which provides:—"Whenever the Superior Court, Court of Oyer and Terminer or Court of General Sessions shall consider that a question of law ought to be heard by the Court in Banc, they shall have power, upon application of either party, to direct it to be so heard; and in that case the Court in Banc shall consist of the Chief Justice and the four Associate Judges."

After listening to exhaustive arguments and the presentation of masterful briefs, by the respective counsel, and considering the same for several months, the said Court in Banc, on June 7, 1910, delivered the following opinion:

Opinion.

PENNEWILL, C. J., with whom concurred CONRAD and HASTINGS, J. J., delivering the opinion of the Court:

Writs of *certiorari* were issued by the Superior Court of this county to The Council of the Mayor and Council of Wilmington, commanding Council to certify to the said Court true and complete records of their proceedings in the above stated cases.

Such records were duly returned, and said Court is required to review the proceedings of said City Council, if it has the power to do so under the Constitution and laws of the State, for the purpose of determining whether the Council had jurisdiction of said cases.

The authority claimed by The Council for the right to hear and determine the said contested election cases is found in the following statutes, viz.:

"An Act in Relation to Municipal Elections to be held in the City of Wilmington," being *Chapter* 727, *Volume* 19, *Laws of Delaware.*

*Section* 27 of said Act is as follows:

"If any candidate for any of the offices before mentioned shall choose to contest the right of any person claiming to have been elected to such office, such candidate shall, within thirty days next after such election, cause to be presented to the said Council of Wilmington, his petition in writing, setting forth particularly the grounds and specifications upon which said election is contested, together with an affidavit that such petition is not for the purpose of vexation and delay but that he does verily believe that he has just grounds for contesting such election, and shall also at the same time cause to be delivered to the person whose election is contested a true copy of said petition. Upon the filing of such petition and affidavit, the Council shall appoint a day not less than ten nor more than fifteen days from the time of filing such petition and affidavit, for hearing and determining the same, giving public notice thereof in two newspapers published in the City of Wilmington, if so many be published at that time, and upon the day appointed for such a hearing the said City Council shall sit in the City Hall, in the presence of

such citizens and others as may choose to be present, shall hear the allegations and proofs of the party, and shall determine according to the very right of the matter.   Evidence shall be confined to the grounds and specifications set forth in the petiton. The Council shall have power to issue subpoenas, signed by the President of Council for the time being, and attested by the Clerk, for persons and papers, including all poll lists, tally lists, statements and certificates delivered to the Department of Elections, Clerk of Council ,Mayor of the City, or any of them, to administer oaths and affirmations to examine witnesses, and to do all other things requisite to arrive at a full and perfect knowledge as to the right of the case.   The decision of The Council, signed by its officers, shall be published in two newspapers printed in the City of Wilmington, if so many be published at that time, and shall be final and conclusive."

And also *Section 30, Chapter 207, Volume 17, Laws of Delaware*, as amended by *Volume 18, Laws of Delaware*, which is as follows:—

"The Council shall hold a meeting for organization, (on the first day of July next ensuing the city election, or if that day falls on a Sunday, then on the Monday following;) and shall further meet at least once in every month, at such time or times and place as it shall appoint.   Special meetings may be called by the Mayor upon his own motion, or shall be called at the request of five members.   The sittings of The Council shall be public.   It shall be the judge of the election returns and qualification of its members, and of all officers of the corporation.   It shall choose its officers except where otherwise provided for in this charter. It shall determine the rule of its proceedings, and keep a journal of the same."

Acting under the authority conferred by said statutes the City Council of the City of Wilmington proceeded to hear and determine the case in which Charles M. Allmond contested the election of Howard D. Ross, who had been returned and certified duly elected Treasurer of the City of Wilmington at an election held on the fifth day of June, 1909; and also the case in which Benjamin B. Allen contested the election of Walter Rash who had

been returned and certified duly elected a member of The Council
of the City of Wilmington at said election.

Each of said cases was, after hearing, determined in favor of·
the contestant, it being held that the contestee was not entitled
to the office in question, and that the contestant was.

It was considered by the Superior Court that the questions
of law involved in said cases should be heard by the Court in
Banc, and accordingly they directed them to be so heard.

It was agreed between counsel that the two cases should be
argued together, that the judgment of the Court should be en-
tered in each case, and that such judgment should be final.

It may be said, broadly, that there are two principal ques-
tions involved in the cases before the Court.

*First*, the jurisdiction of this Court; and

*Second*, the jurisdiction of the City Council or Court below.

There has never been, perhaps, in the history of this State,
a case prepared with more thoroughness, labor and care, or pre-
sented to the Court with more ability, clearness and force, than
those now before us.  It is because of such fact, as well as on
·account of the important questions involved, that we have given
to the cases so much time, labor and thought.

Many exceptions have been filed by the respondents to the
record of the lower Court, but we shall not attempt to notice them
specifically.  Such exceptions may be divided into two classes,
viz.:

*First*, those that challenge the constitutionality of *Chapter*
178, *Volume* 24,. *Laws of Delaware;* and *second*, those that at-
tack the validity of the judgments of the City Council because the
record discloses that in hearing and determining the causes below
The Council did not proceed in the manner prescribed by *Section*
27 *of Chapter* 727, *Volume* 19 *of Delaware Laws.*

In order that the questions raised may be clearly understood,
it is necessary that certain Acts of the General Assembly, and
certain constitutional provisions, shall be set out in whole or in part.

The Act published as *Chapter* 177, *Volume* 24, and entitled
"An Act to alter and re-establish the Statutes relating to the City
of Wilmington," reads as follows:—

"*Section* 3.    That *Section* 29 of said *Chapter* 207, *Volume* 17, *Laws of Delaware*, as amended, be amended by striking out all of said Section, and inserting in lieu thereof a new Section to be known as *Section* 29, as follows:—

" 'On and after the first day of July, A. D. 1907, The Council shall consist of a President of Council and twelve other members. At the City election to be held on the first Saturday in June, A. D. 1907, and every fourth year thereafter, there shall be elected a President of Council and twelve members of Council, for the term of two years commencing on the first day of July next succeeding said election.   The President of Council shall be the presiding officer, and a member of said Council and shall be elected from the City at large by a plurality of all the votes cast in the several election districts of the City.   One member of Council shall be elected from each Ward of the City by a plurality of all the votes cast therein.' "

"*Section* 4.    That *Section* 32 of said *Chapter* 207, *Volume* 17, *Laws of Delaware*, as amended, be amended by striking out said Section, and inserting in lieu thereof, the following Section to be known as *Section* 32, viz.:

" 'At the City election to be held on the first Saturday in June, A. D. 1907, and on the same day in every fourth year thereafter, the voters in the respective election districts shall vote for a City Treasurer, who shall be elected by plurality of all the votes cast in the several election districts in the City.   The City Treasurer shall hold office for the term of two years, commencing on the first day of July next succeeding his election.   On and after the first day of August, A. D. 1907, the City Treasurer shall appoint a clerk for his office, to be known as City Treasurer's Clerk, who shall hold office at the pleasure of the City Treasurer. The City Treasurer shall have power to discharge said Clerk at any time, and his acts in this regard shall not be questioned. Such Clerk shall receive a salary of nine hundred dollars per year, payable in the same manner as other City officers are paid.   The Council shall have power by ordinance to increase the salary of such Clerk at any time.' "

The Act published as *Chapter* 178, *Volume* 24, *Laws of Delaware*, is as follows:—

"*Section* 1. That *Section* 1 of an Act entitled "An Act to alter and re-establish the Statutes relating to the City of Wilmington," passed at Dover, March 15th, 1907, be amended by striking out of said *Section* 1 the word "fourth" wherever it appears in said Section and inserting in lieu thereof the word "second."

"*Section* 2. That *Section* 3 of this Act be amended by striking out of said *Section* 3 the word "fourth" wherever it appears in said Section, and inserting in lieu thereof the word "second."

"*Section* 3. That *Section* 4 of said Act be amended by striking out of said *Section* 4 the word "fourth" wherever it appears in said Section, and inserting in lieu thereof the word "second."

It is the last mentioned Act under which the city election in question was held, and there is and was at the time the election was held, no other law which authorized the holding of the same, inasmuch as said *Chapter* 177, provides for quadrennial and not biennial elections, and the last election was held thereunder in 1907.

The constitutional provisions deemed to be pertinent to the questions to be determined, are as follows:—

*Article* 2, *Section* 10, *of the Constitution of* 1897. "Each House shall keep a journal of its proceedings, and publish the same immediately after every session, except such parts as may require secrecy, and the yeas and nays of the members on any question shall, at the desire of any member, be entered on the journal. No bill or joint resolution, except in relation to adjournment, shall pass either House unless the final vote shall have been taken by yeas and nays, and the names of the members voting for and against the same shall be entered on the journal, nor without the concurrence of a majority of all the members elected to each House."

*Article* 2, *Section* 8, *of the Constitution of* 1831. "Each House shall keep a journal of its proceedings, and publish them immediately after every session, except such parts as may require

secrecy; and the yeas and nays of the members on any question shall, at the desire of any member, be entered on the journal "

*Section* 2 of the Act respecting original bills, *Chapter* 35, *Volume* 17, *Laws of Delaware* is as follows:—

"*Section* 2.    That hereafter the Secretary of the Senate and the Clerk of the House shall, at the end of each session of the General Assembly, deliver to the Secretary of State, for the time being, all the original bills, resolutions, petitions, &c., of the session just ended, to be by him labeled and filed as aforesaid; and it shall also be the duty of the said secretary and the said clerk, · so soon as their respective journals have been published, to deliver the originals to the State Librarian, to be by him placed in the State Library."

The contestants have moved that the writs of *certiorari* be dismissed for want of jurisdiction in the Superior Court, out of which said writs were issued.

The first question, therefore, to be determined, is whether a writ of *certiorari* will lie to review the proceedings of the Council of the City of Wilmington in a contested election case.

This motion, as we understand it, is based upon the following grounds, viz.:—

1.    That there is no constitutional authority for the issuance of such writ from the Superior Court to the City Council, the only provision in the constitution respecting the writ of *certiorari* being that found in sub-section 5 of *Section* 12, which is as follows:—

"The Supreme Court shall have jurisdiction, * * * to issue writs of prohibition, *certiorari*, and mandamus to the Superior Court, the Court of Oyer and Terminer, the Court of General Sessions, the Court of Chancery and the Orphans' Court, or any of the judges of said Courts, and all orders, rules, and processes proper to give effect to the same."

And it is further contended that the only other authority for the issuance of such writ is statutory, and found in *Revised Code* 698, *Section* 7, which is in the following words:—

"Each of the judges of the Superior Court shall have power and authority to frame and issue writs of *habeas corpus,* cer-

*tiorari* and all remedial writs or process necessary for bringing the causes in said Court to trial, and for carrying the judgments of said Court into execution."

Therefore, it is argued, as there is no constitutional right to the writs of *certiorari* from the Superior Court to the City Council the respondents below must rely upon the statute above quoted, which, however, is subject to limitation or repeal by other statutes subsequently passed and inconsistent therewith.

The contestants claim, and apparently with much confidence, that when the legislature enacted the statute which made the decision of the City Council final and conclusive in contested election cases, such statute repealed the Act which gave to the Superior Court the power to issue writs of *certiorari*, so far as such cases were concerned.

This we believe to be the argument made by the contestants upon the motion to dismiss the writs of *certiorari* issued in the cases at bar. Many cases have been cited in support of their contention, but we shall not attempt to review all of them; and under one view of the law of this State respecting the writ of *certiorari* it seems unnecessary to consider more than one of them at length.

The position taken by the contestants would seem much stronger if their premises could be regarded as sound. It appears, however, to us that there is a fundamental fallacy in the assumption, that the authority of the Superior Court to issue writs of *certiorari* to inferior Courts or tribunals, is entirely statutory.

There can be no doubt that the writ of *certiorari* as known in this State was a common law writ, issued from a Superior Court, directed to one of inferior jurisdiction, and commanding the latter to certify and return to the former the record in the particular case. This fact is clearly recognized by *Woolley* in his work on *Delaware Practice, Volume* 1, 625, where the writer says:

"In Delaware the writ of *certiorari* is not a statutory writ, but is a writ which retains the essential characteristics of the writ at common law."

But there can be no need to cite authority to sustain the proposition that the writ of *certiorari* as known here was a common law writ.

Is the authority of the Superior Court of this State to issue such writ constitutional or statutory? Apparently both, but primarily and essentially constitutional. By statute, *Revised Code* 92, *Section* 7, the Judges of the Superior Court are authorized to hear and determine all and all manner of pleas as fully and amply as the Justices of the King's Bench, Common Pleas and Exchequer of England may or can do. But, by the Constitution of 1831, *Articte* 5, *Section* 3, the Superior Court was given jurisdiction of all causes of a civil nature, real, personal and mixed, at common law, and all other the jurisdiction and powers vested by the laws of this State in the Supreme Court or Court of Common Pleas.

"The Court of Common Pleas had power to hear and determine all and all manner of pleas, actions, suits, and causes, civil, real, personal and mixed, according to the laws and constitutions of this government, as fully and amply to all intents and purposes as the Justices of the King's Bench, Common Pleas and Exchequer of England, or any of them, may or can do."

*Hall's Digest* 182, *Section* 15.

It also appears from said *Digest* 104, *Section* 2, that each of the Judges of the Supreme Court had "full power and authority, when and as often as there should be occasion, to issue forth writs of *habeas corpus, certiorari* and all other remedial writs, or other process, necessary for bringing causes in the said Court to trial, and for carrying the judgments or decrees of said Court into execution." And from *Section* 3, that the said Supreme Court "generally administers justice to all persons, and exercises the jurisdiction and powers hereby granted them, concerning all and singular the premises, according to law and equity, as fully and amply, to all intents and purposes whatsoever, as the Justices of the King's Bench and Common Pleas at Westminster or the Chancellor of England, may or can do."

It is therefore clear that prior to the adoption of the constitution of 1831, the Supreme Court and Court of Common Pleas of this State, as they existed under the then Constitution, possessed the power to issue writs of *certiorari*, and to hear and determine causes thereon.

We do not know of any law of this State that has undertaken to limit the scope, or define the character, of this writ; and must, therefore, assume that it is the writ as known to the common law.

The Constitution of 1831, having, as already stated, conferred upon the Superior Court all the powers of the Supreme Court and Court of Common Pleas; and the present Constitution —*Article* 4, *Section* 7—having vested the same powers and jurisdiction in the Superior Court, the last named Court unquestionably has the authority to issue the common law writ of *certiorari* in any case in which it was proper at common law.

From this review of the constitutional provisions of our State, it is manifest that since 1831, the power of the Superior Court to issue writs of *certiorari*, and hear causes thereon, has been and is constitutional; and such being the case we think it will not be seriously contended that a jurisdiction which is constitutional could be taken away by statute.

There can be no doubt that in England, prior to 1831, the Courts had the power to issue the writ of *certiorari* to an inferior Court, or tribunal, of limited jurisdiction for the purpose of ascertaining whether such inferior Court or tribunal had jurisdiction to hear and determine a contested election case. It necessarily follows, therefore, that the Superior Court of this State has the authority to issue such writ to The Council of the City of Wilmington for a like purpose.

In the case of *Murphy vs. City of Wilmington*, 6 *Houst.* 108, the Court of Errors and Appeals, quoting Judge Dillon with approval said:

"The unquestionable weight of authority in this country is that if an appeal be not given, or some specific mode of review provided, that the Superior common law Courts will, on *certiorari*, examine the proceedings of municipal corporations, even though there be no statute giving this remedy; and if it be found that they have exceeded their chartered powers, or have not pursued those powers, or have not conformed to the requirements of the charter of law under which they have undertaken to act, such proceedings will be reversed or annulled."

24 Del.]     Rash vs. Allen; Ross vs. Allmond.          457

Opinion.

*Second.* The contestants base their motion for the dismissal of the writs of *certiorari* on the further ground, that even though the authority to issue the writ of *certiorari* is constitutional, the writs before this Court should be dismissed because under the statute under which the election contests in question were heard, the decision of The Council was final and conclusive.

The case of *State vs. City Council*, 3 *Harr.* 294, is cited in support of this proposition. In that case a rule had been issued requiring The Council to show cause why a *mandamus* should not issue commanding them to admit one John Hagany to the office of City Treasurer. The Court in delivering their opinion said:— "Under this general power the Court of King's Bench in England has repeatedly and always exercised the right to issue the writ of *mandamus* to public corporations in cases similar to the present, and as this Court has the same powers as the Court of King's Bench, *which cannot be taken away but by express exclusive words*, we have no doubt of our jurisdiction in the case before the Court."

It is argued, that inasmuch as the legislature has, since that case was decided, provided that the decision of the City Council in a contested election case shall be final and conclusive, the power of this Court to review the action of The Council in the present cases has been taken away "by express exclusive words."

We cannot believe that in the case above mentioned the Court meant to declare that the constitutional power to issue a writ of *certiorari* for the purpose of determining whether the City Council had jurisdiction of a contested election case could be taken away by statute, no matter how "express and exclusive" the words might be. If the Court had in mind the constitutional authority vested therein, they must have meant "express exclusive words" of as high authority as the power given, to-wit: of the constitution.

The case of *Reed vs. Hickman*, 4 *Harr.* 478, cited by complainants below, is not at all in point, the Court holding merely that a *writ of error* to the *Court of General Sessions* would not lie, there being no constitutional authority therefor.

What did the legislature mean by the statutory provision that the decision of the City Council should be final and conclusive? Manifestly it meant that such decision should be final and conclusive so far as the merits of the case are concerned, that is, as to the question The Council was to determine,—the election that might be contested.

It could not have meant, or intended, that the proceedings of The Council could not be reviewed by the appellate tribunal for the purpose, or to the extent, of ascertaining whether The Council had jurisdiction of the cause, had exceeded its jurisdiction, or had not exercised the same according to law. To hold otherwise would be to make the City Council superior to the constitution of the State, and to vest it with powers greater than any Court of limited jurisdiction, or any inferior tribunal, in this State has ever possessed. It would enable The Council to hear and determine an election case without notice of any kind, without due process of law, without jurisdiction, and indeed in absolute disregard of the rights of the contestee, constitutional or otherwise. Such arbitrary and unlimited power would be not only dangerous, but it is inconceivable and impossible under our system of government.

But the words "final and conclusive," in the statute, have some meaning. What is it? It is simply this: That the action and decision of The Council shall not be reviewable so far as the merits are concerned. It did not mean that it might not be reviewed to the extent of ascertaining whether The Council had jurisdiction, had acted in excess of its jurisdiction or exercised the same contrary to law. This we hold to be the law, and our conclusion is amply supported by authority as well as reason.

4 *Enc. Pl. and Pr.* 12, 73, *Commissioners vs. Thompson* 15 *Ala.*, 133 *and* 18 *Ala.* 694; *Peters vs. Peters* 8 *Cush.* (62 *Mass.*) 529 (537); *Cardiffe's Case*, 1 *Salk.* 146; *Niblow vs. Post*, 25 *Wend.* 280, 15 *Cyc.* 395-6-7.

In view of the constitutional character of the jurisdiction of the Superior Court to issue writs of *certiorari* in all cases in which such writ was proper at the common law, many of the cases cited by the complainants below can have no application. But few of them are *certiorari* cases, and most of them hold simply that

the action of the inferior tribunal respecting the merits of the case cannot be reviewed. We do not recall that any of them, except the *Carpenter case in* 14 *Pa. St.* 486, go to the exact point we are now considering, and hold that the jurisdiction of the inferior Court cannot be inquired into, if the decision of such Court is made final and conclusive by statute, when the right of review vested in the appellate Court is constitutional. We do not think it necessary, therefore, to notice any of the cases except the *Carpenter* case.

While that case seems to be an authority in support of the position taken by the contestant, we think that in the light of the interpretation, or construction placed upon the opinion of the Court by other Courts of the same State in cases subsequently decided, the real meaning of the opinion was that the lower Court, being required by statute to "proceed upon the merits of the case," its decision thereon should be final. Such has been the position taken by the Courts of that State in later cases, and it is entirely consistent with our conclusion in the present cases.

*Chase vs. Miller*, 41 *Pa. St.* 403; *Election cases* 65 *Pa. St.* 20; *Sheppard's case*, 77 *Pa. St.* 296.

These were *certiorari* cases, and in some, if not all, the same statute was involved as in the *Carpenter* case.

In the case of *Chase vs. Miller*, the Court said:
"Our correctional power extends no further in such cases than to keep the Court within the limits of its jurisdiction, and to see that it is exercised with regularity according to law." In the case in 65 *Pa. St.* it was held, "that the merits belong exclusively to the Court below and cannot be reversed, is a settled question," citing as authority *Carpenter's* case. In *Sheppard's* case the Court said: "The Supreme Court then having no power to reverse the merits can only, under its general power to supervise the proccedings of inferior Courts (tribunals), bring up the record for this specific purpose—to see that there was no excessive exercise of power by the Court below which demands correction."

In the application of the principle we have stated, that is, the right of the Superior Court upon *certiorari* to review the proceedings of the City Council in matters jurisdictional, we think

there can be no distinction between the two cases before us,—the one involving the election of a member of Council, and the other the election of a City Treasurer.

The City Charter at *Section* 30, provides, *inter alia*, that the City Council "shall be the judge of the election and returns and qualifications of its members, and of all members of the corporation." The City Council is made a special tribunal, a Court of special and limited jurisdiction, and the statute authorizes such tribunal, by a special procedure therein prescribed, to hear contests of the elections of city officers, including members of the City Council. This provision of the charter places the members of The Council on the same footing as other city officers, including the City Treasurer.

A contest of the election of a member of Council and of a City Treasurer, must, therefore be conducted by the same special tribunal, and by the same special method of procedure; and no judgment can be rendered in the one case different in character or broader in scope than that rendered in the other.

Being clearly of the opinion that the writs of *certiorari* in question were issued in pursuance of the power and authority conferred by the constitution, we think this Court has the power to review the proceedings of The Council of the City of Wilmington, in the cases before us, for the purposes we have indicated above. The motion to dismiss is therefore refused.

Having determined that the writs of *certiorari* were properly and legally issued for the purpose of ascertaining whether the Court below had jurisdiction to hear and determine said cases; and believing that the respondents below have such interest in the decision of the cases here, and had in the contests below, as will enable them to sustain their writs of *certiorari*, it becomes necessary to determine whether the Act, *Chapter* 178, *Volume* 24, *Laws of Delaware*, under which the city election was held in the month of June last was valid or invalid.

The constitutionality of said Act being challenged, how shall this Court determine whether it was constitutionally passed or not?

It is not denied that the Act was regularly enrolled, duly signed by the presiding officers of the two houses of the legislature, approved by the Governor, deposited in the office of Secretary of State, and published with the laws passed at the session of 1907. Such being the case it is claimed by the contestants, not only that every presumption is in favor of its validity, but that this Court is bound to take judicial notice of the Act as a valid Act, the same being beyond proof to the contrary. This is known as the enrolled act doctrine.

The respondents contend that the enrolled act, duly authenticated as above stated, is not conclusive of the validity of the act, but when challenged on the ground of the unconstitutionality of its passage, the Court may, and should, examine the legislative journals for the purpose of ascertaining whether it was constitutionally passed. This is known as the journal entry doctrine.

Perhaps the most important question to be determined, is whether the Court can notice the legislative journals for the purpose of impeaching an Act of the legislature which has been duly enrolled, signed by the Speakers and approved by the Governor.

It must be admitted that the cases on this point are in conflict—some supporting the enrolled act doctrine broadly, and following the English or common law rule, which holds the enrolled bill to be conclusive of the validity of the act, and permits no resort to the journals whatever.

Other States, and a very decided majority of them, recognize what is now regarded as the American rule, which not only permits, but makes it the duty of the Court to examine the journals for the purpose of ascertaining whether the act in question was constitutionally passed.

This rule has been more liberally construed in some States than in others, depending largely upon the character and phraseology of the constitutional provision. Some Courts have carried the presumptions in favor of the enrolled bill farther than others, and in a few of the States the decisions upon the subject are apparently in hopeless confusion.

To refer intelligently to many of the cases cited would entail a great amount of labor, and unduly extend this opinion;

to undertake to review all of them would be a hopeless task.

It is not uecessary that we should seek to classify the authorities with respect to their support of the one rule or the other, because that has been done by at least two Courts which have taken the trouble and pains to discover which rule had the endorsement of the majority of the States.

We refer to the cases of *State vs. Swan*, 40 *L. R. A.* (7 *Wyo.* 166); and the case of *Union Bank vs. Commissioners of Oxford*, 119 *N. C.* 214, (34 *L. R. A.* 487).

In the Wyoming case it was found, and so stated in the opinion of the Court, that "the States in which it is held competent to resort to the journals to ascertain, whether, in the enactment of a law, the constitutional requirements have been complied with, were in number twenty-one; and the States holding the contrary doctrine nine."

In the North Carolina case the Court used the following language: "Accordingly the law is well settled in nearly 100 well adjudicated cases in the Courts of last resort in thirty States, and also by the Supreme Court of the United States, that when a State constitution prescribes such formalities in the enactment of laws as require a record of the yeas and nays on the legislative journals, these journals are conclusive as against not only a printed statute, published by authority of law, but also against a duly enrolled act.   The following is a list of the authorities, in number ninety-three, sustaining this view either directly or by very close analogy.  *   *   *   It is believed that no Federal or State authority can be found in conflict with them.

"Decisions can be found, as, for instance, *Car vs. Coke (Supra)*, to the effect that, where the constitution contains no provision, requiring entries on the journal of particular matters,—such for example, as calls of the yeas and nays, on a measure in question— the enrolled act cannot, in such case, be impeached by the journals.   That, however, is a very different proposition from the one involved here, and the distinction is adverted to in *Field vs. Clark*, 143 *U. S.* 671."

We make particular reference to these two cases, not only because of their classification of the decisions, but also for the

clear, able and elaborate exposition of the law therein contained. Other decisions, large in number, and to the same effect, might be cited, but they would contain nothing essentially different from those to which we have referred. Any extended reference to them, therefore, would lengthen rather than strengthen this opinion.

We will refer to but a very few of the many other authorities which support the American, or journal entry rule.

The North Carolina case to which we have referred is especially instructive and helpful for a particular reason. That was one of the States in which the law seemed to be in confusion when dealing with questions arising under constitutional provisions that were not clearly mandatory. There was a conflict in the cases even then. But, when in the Union Bank case the Court were passing upon the validity of an act authorizing the creation of the indebtedness of a town, which could not be constitutionally passed unless "the yeas and nays on the second and third reading of the bill shall have been entered on the journal," it was held that, as the journals showed affirmatively that the yeas and nays were not entered on the journals the act was void. Other Courts of that State had based their decisions upon constitutional provisions that could be regarded as directory, but this Court was passing upon a provision that was mandatory, like our own, and in a very able and exhaustive opinion sustained the journal entry doctrine.

Judge Cooley in his work on *Const. Limitations* (7 *Ed.*) 193, says: "Each house keeps a journal of its proceedings which is a public record, and of which the Courts are at liberty to take judicial notice. If it would appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the Courts may act upon this evidence, and adjudge the statute void. But whenever it is acting in apparent performance of legal functions, every reasonable presumption is to be made in favor of the action of a legislative body; it will not be presumed in any case, from the mere silence of the journals, that either house

has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless when the constitution has expressly required the journals to show the action taken, as, for instance, where it requires the yeas and nays to be entered."

We have quoted Judge Cooley's language because of the great respect that his opinions always command, and also because of the fact that it is upon the authority of his opinion that many of the decisions in support of the American rule have been based.

And to the same effect is *Sutherland on Statutory Construction at Sections* 46 *&c.*

"The presumption is that an act properly authenticated was regularly passed, unless there is evidence of which the Courts take judicial notice showing the contrary. The journals are records, and, in all respects touching proceedings under the mandatory provisions of the constitution, will be effectual to impeach and avoid the acts recorded as laws and duly authenticated, if the journals affirmatively show, that these provisions have been disregarded.—The journals, by being required by the constitution or laws, are records. * * *

"When required, as is extensively the case in this country, by a paramount law, for the obvious purpose of showing how the mandatory provisions of that law have been followed in the methods and forms of legislation, they are thus made records in dignity, and are of great importance. The legislative acts regularly authenticated are also records. The acts passed, duly authenticated, and such journals are parallel records, but the latter are superior, when explicit and conflicting with the other; for the acts authenticated speak decisively only when the journals are silent, and not even then as to particulars required to be entered therein."

We have read all the decisions cited by counsel on both sides of the question, as well as many not cited, and unhesitatingly say that a very large majority of them sustain the American rule, viz.: that resort may and should be had to the journals when the validilty of the act is attacked because of the failure of the

legislature to observe, in the passage of the act, such a mandatory requirement as that contained in our constitution, which provides that no act shall be passed unless the yeas and nays are called and entered on the journal. It is a very different proposition when the entry of the yeas and nays is directory and not mandatory, or a prerequisite to the validity of the act. Many of the cases cited *contra* can be explained and distinguished upon this ground.

We think it may be said, that in almost, if not in every case, in which the enrolled act doctrine has been sustained, the Court have based their decision on one of the following grounds:—

1. That such is the rule of the common law, clearly established and ancient.

2. That in the structure of our State governments the judicial and legislative departments are made co-equal; that the one has no right of supervision over the other, and, therefore, the judicial branch cannot with propriety erect itself into the custodian of the good faith of the legislative department.

3. That public policy requires that an enrolled act properly attested shall be conclusive proof of the validity of the act, because of the unreliability of the legislative journals.

4. That the constitutional provision is directory and not mandatory.

5. That the constitution has expressly provided a mode of authenticating the act.

Such, in the main, were the reasons given for the decision in the leading case of *Pangborn vs. Young*, 32 *N. J. Law Rep.* 29, and we propose to deal with them specifically.

In regard to the first ground we say, that the "well established common law rule" was based on the power of Parliament, which was practically absolute and transcendent. It was at the time the rule was declared, a high Court of judicature, and its records were necessarily those of a Court which spoke absolute verity, and could not be questioned. And, it must be remembered that in England there was no written constitution, the restrictions upon parliamentary action were but slight, and it is natural that the doctrine should have been established, that the

enrolled bill, as found properly authenticated in the established depository, should be held to be conclusive of the validity of the act. But there has grown up in this country a rule which is called the "American doctrine," and which is predicated upon our peculiar system of government founded upon written constitutions, and upon the peculiar provisions of those constitutions. Some of the American Courts, have blindly followed the English rule notwithstanding our changed conditions, and the mandatory provisions contained in our written constitutions. As one American Court said: "Because such a rule obtains as to the Parliament of Great Britian, under a monarchial form of government, that cannot be regarded as a very potent reason for its application in this State; where the will of the sovereign power has been declared in the organic law."

*Second.* While, under the theory and structure of our State government, the legislative and judicial departments are co-equal it does not follow that the latter may not declare an act invalid which has been unconstitutionally passed by the former. Certainly the supreme power—the people—have the right to impose limitations upon the power of either; and no one will deny, that the people, speaking through their fundamental law, may declare what shall be a prerequisite to the validity of a legislative act. If such power exists there must be some tribunal which has the right to determine whether or not the mandate of the constitution has been obeyed. Under our system of government where can such power be lodged except in the Courts? If not there, it is nowhere; and it necessarily follows that the legislature is above the law, greater than its creator, and the constitution a vain and useless thing in so far as it seeks to impose restrictions upon the legislative department. If the Courts have the power to decide whether or not a law constitutionally passed is valid, by what course of reasoning can it be held that they have not the power to decide that an act was unconstitutionally passed?

In the case of *Ritchie vs. Richards*, 14 *Utah* 345, the Court speaking upon this point said: "This would place the legislature, in the mode of the enactment of laws, beyond the control of the

sovereignty itself, and the limitations contained in the constitution respecting the manner of enacting laws would be mere useless verbiage. With all due respect to that co-ordinate branch of the government, I cannot consent to a proposition that would invest it with a power so arbitrary.—Limitations are not peculiar to any one branch of the government, but they are imposed as a security to the rights of the principal—the people. The power of the government is vested in the three departments, to be exercised subject to these limitations. The power to decide what the law shall be is legislative. The power to declare what is the law is judicial, and is delegated to the judicial department; and therefore the Courts have the unquestioned right to declare any act of the government, in any of the departments, which violates the constitution, to be utterly void. This right or power necessarily includes the power to declare what enactments of the legislature are, and what are not, laws; and in exercising this function the Courts do not trench upon the domain of the legislative department, although they pass judgment upon its official acts."

In the case of *People vs. Petrea*, 92 *N. Y.* 128, the Court said: "The legislative power vested in the Senate and Assembly is subject to the limitations of the constitution, and it needs no citation of authorities to show that the legislature, like every other department of the government, is subject to the supreme will of the people as expressed in the organic law."

*Third.* In the cases at bar, counsel favoring the enrolled act doctrine, base their arguments largely upon what they conceive to be grounds of public policy,—insisting that dire and calamitous consequences would follow from a recognition of the journal entry rule.

This is an argument that should have no force in the judicial determination of the constitutionality of a statute. It may appeal to the legislature in the passage of an act, but not to the Court in passing upon its validity. If there is any principle of law well established, it is that when the Court has clearly ascertained what the law is, they must declare it regardless of what the

consequences may be.   No one will dispute this proposition, and it is not necessary for us to say more in relation thereto.

But even if it were necessary to defend the journal entry doctrine from attack based upon grounds of public policy; we are convinced that much could be said in its favor.

In the first place, in none of the many States where such doctrine has been recognized has it been followed, so far we have learned, by any unfortunate consequences at all.   And it can be readily seen why it should not have been.   One effect of its recognition would naturally be to make the legislature careful with respect to their procedure and journal entries, if they were not so before.

And, if such a loose practice has grown up in this State respecting the keeping of the journals, as counsel for the contestants represent, the fault is not in the law, and certainly no reasonable excuse can be given therefor.   If the journals are so loose, incomplete and inaccurate as counsel contend, then is it not true that the sooner an improvement is made in that regard the better it will be?   If but scant attention is given to the reading and correction of the journals might it not be well if it should be understood that a very important legislative duty had not been properly or adequately performed?   This is not a duty to be performed in a perfunctory or careless way, and we are not convinced that it has been.   We do not believe the members and clerks of the two houses have treated it so lightly, and, therefore, we are willing to accept their journals as correctly reporting legislative action so far as it is required by the constitution to be shown.   It should be borne in mind that the journals are not kept merely in pursuance of some rule of legislative procedure, nor even in compliance with some statutory requirement, but in obedience to the mandate of the organic law.   They are, therefore, constitutional records, evidently designed to be, and are of great importance and sanctity, and with respect to matters *required by the constitution to be recorded therein*, they should speak verity, and we must assume they do.

It may be said that the enrolled bill constitutes better evidence of what the legislature does than the journal because of the

certainty which exists that it was enrolled precisely as it was agreed to. But are not the clerk and enrolling committee as liable to make a mistake as the clerk who makes up the journal under the supervision of the whole body of the house, whose business it is to see that the journal correctly states the action of the body?

And there is another thought in connection with the ground of public policy. Can there be any sounder public policy than obedience to the constitution? Or, to put it in another way, can there be any sound public policy that involves a disregard of a plain requirement of the constitution? We think not. The constitution clearly means that no bill shall be passed unless the yeas and nays are called and entered on the journal. But it is argued that even if that be so, and the journals clearly and affirmatively show that such a requirement was not observed in the passage of the act, the enrolled bill should be conclusive nevertheless, because public policy demands it. We cannot accede to such a doctrine. It is our conviction that even though the consequences likely to follow from a recognition of the journal entry doctrine would be bad, and very bad; they could not be so bad as would be the palpable disregard of a plain mandate of the constitution.

But after all, it is not for this Court to decide whether the English or American doctrine, is the better and safer one to adopt, but rather, which one we are compelled to recognize under the provisions of our constitution. If the people of the State, on grounds of public policy or for any other reason, should think the enrolled act doctrine the better one, it is for them by appropriate means to so change the constitution as to ensure its recognition. It cannot be done by judicial construction.

It is very difficult for us to believe it to be seriously contended that an enrolled act shall be conclusive if the constitution plainly says that a bill shall not be passed unless the yeas and nays are entered on the journals, which are required by the constitution to be kept and published, and it clearly appears from the journals that the yeas and nays were not entered. Such a contention would seem to be equivalent to holding that such lan-

guage in a constitution is of no effect, and that the sovereign power—the people—cannot by their organic law impose any limitation upon legislative power in the passage of an act.

*Fourth.* Those who uphold the enrolled act doctrine may insist that the provision in our constitution respecting the entry of the yeas and nays is directory and not mandatory. But we cannot see how such a contention can be reasonably, or even plausibly, made. It will be admitted that the provision in relation to the taking of the vote by yeas and nays is mandatory, and that the provision in relation to the concurrence of a majority of all the members elected, is equally so. But it may, nevertheless be argued that the provision respecting the entry of the yeas and nays, which lies between the other two, is directory only.

The three provisions read together are as follows:

"No bill * * * shall pass either House unless the final vote shall have been taken by yeas and nays. and the names of the members voting for and against the same shall be entered on the journals, nor without the concurrence of a majority of all the members elected to each House."

Can it be possible that the first clause, and the last are mandatory, and the other not? It seems to us that such a construction would be not only forced and unnatural, but also highly technical, even from a grammarian's point of view.

It might possibly improve the grammar just a little if the word "unless" were inserted between the word "and" and the word "the," so that the clause would read "and *unless* the names of the members voting for and against the same shall be entered on the journal."

But manifestly the word "unless" is to be understood; that is, the meaning is the same as though it had been employed. Such is the natural meaning of the language used, and the meaning that would be commonly given thereto. We do not remember that counsel for the contestants with all their astuteness and powers of discrimination, undertook to argue that the words were susceptible of any other or different meaning.

The provision in the New Jersey constitution in reference to the entry of the yeas and nays might very naturally be held to

be directory, it being as follows: "No bill or joint resolution shall pass unless there be a majority of all the members of each body personally present and agreeing thereto; and the yeas and nays of the members voting on such final passage shall be entered on the journals." The provision ends there, and while the language is practically the same as ours, so far as it goes, its position, in relation to the clause that follows, makes it admit of a different construction and meaning.

The provision in our constitution is more like that in the constitution of Wyoming, which is as follows: "No bill shall become a law except by a vote of a majority of all the members elected to each house, nor unless on its final passage the vote be taken by yeas and nays, and the names of those voting be entered on the journal."

No Court, we think, has ever doubted the mandatory character of such a provision or found it in any wise ambiguous or uncertain. We are satisfied that the language of the Delaware Constitution is just as free from uncertainty, and just as mandatory. But after all the best test of the meaning of common words, ordinarily used, is the usual acceptation and significance given to them; and we feel certain that rare indeed would be the instance when any one would understand the language referred to otherwise than it would be understood if the word "unless" were inserted as we have indicated.

It is a well settled principle of construction that a statute, or constitutional provision, should be read and understood according to the most natural and obvious import of the language used.

The Courts of some of the States have gone so far as to hold that where the constitution provides that no bill shall become a law, or be passed, unless the vote is taken by yeas and nays, the failure of the journal to show a compliance with such provision is proof that such vote was not taken, even though the entry on the journal is not made a prequisite to the validity of the act.

But under our Constitution the validity of the act is expressly made dependent upon three things: (1) A yea and nay vote on its final passage; (2) The entry thereof on the journals, and (3) a

majority in its favor of all the members elected. The evidence of a compliance with the first and third requirements must be furnished by a compliance with the second; and the absence of such evidence constitutes clear proof of the failure of the legislature to observe the constitutional requirements in the passage of the act. When the validity of the act depends upon a yea and nay vote, and the entry thereof on the journals, the failure of the journals to show the yeas and nays is held to be not silence in the ordinary sense, but a sufficient showing that such vote was not taken. This rule is too well recognized both by text writers and Courts to admit of any serious question.

*Fifth.* It will be observed by a careful examination of the decisions in a number of the States which are classed as upholding the enrolled act doctrine, that the constitution has expressly provided a mode of authenticating the act. This will be found to apply to Indiana, Tennessee, Texas, Louisiana, Washington, South Dakota, Kentucky, Mississippi, Nevada, and several other States in whose constitutions there is a provision that requires that all bills passed shall be signed by the presiding officers of the respective houses; and in some of them such fact must be entered on the journal. The Courts of such States have based their decisions largely upon this constitutional requirement, and accordingly have held that where "the act, the validity of which is questioned, is thus attested, by sworn public officers in the form required by the constitution, they would not permit it to be impeached by the journals." And in the language of another Court—"This Court must accept as legislative enactments all such acts as are duly authenticated in the mode provided by the constitution."

*Evans vs. Brown*, 30 *Ind.* 541.

In *Koehler vs. Hill*, 60 *Iowa* 543, the Court after saying, "It cannot be possible that such enrolled bill or resolution can supersede or constitute more reliable evidence than the journals—which were kept in strict accord with the requirements of the constitution;" continued: "For fear we may be misunderstood we will repeat that, when a bill or joint resolution is required to be signed by the presiding officers and the Governor,

and it is so signed, it will be conceded that such bill or resolution constitutes the ultimate and conclusive evidence of the contents thereof."

When it is considered that our constitution does not require the act to be signed by the Speakers, and that the constitutions of such States as we have referred to do not provide that no bill shall be passed, or become a law, unless the yeas and nays are taken and entered on the journal, it is manifest that the decisions in such States are not in point. It is a reasonable construction of the provisions in their constitutions that such formalities, and requirements, strictly complied with, shall furnish the absolute evidence of the constitutional passage of the act.

Our constitution does provide that an act when "passed" shall be presented to the Governor, and he may approve or withhold his approval. If he fails to approve, the bill may still become a law. By the word "passed," of course is meant passed in the manner prescribed by the constitution. It is manifest that if the Governor does approve, his approval cannot be conclusive of the validity of the statute.

Judge Cooley in the case of *Attorney-General vs. Joy*, 55 *Mich.* 94, said: "A bill that has not been passed according to the conditions prescribed by the constitution does not become a law by receiving the Governor's signature, and by publication among the statutes."

Believing that the cases cited by the contestants are not in point for the reason that the constitutional provisions in those States are different from ours, it seems unnecessary to comment upon any of them. But we will notice the three leading authorities, upon which practically all the rulings and decisions of a similar character in other cases have been based.

We refer to *Pangborn vs. Young*, 32 *N. J. Law Rep.* 29; *Field vs. Clark*, 143 *U. S.* 649, and *Sherman vs. Storey*, 31 *Cal.* 253.

Chief Justice Beasley in the course of his opinion in the *Pangborn* case said, in speaking of the enrolled bill properly authenticated:

"These are the sanctions which the legislature has provided for the authority, for the authentication of its own acts both to

the public and to the judicial tribunals, and the question, therefore, is whether such authentification is conclusive, or in other words, whether the legislature does not possess the right of declaring what shall be the supreme evidence of the authenticity of its own statute. I think the rule thus adopted accords with public policy."

The Chief Justice also speaks of the careless manner in which the journals are kept, and concludes that such evidence is wholly unreliable. He asks, "With what propriety can the judicial branch erect itself into the custodian of the good faith of the legislature," and says: "I can discover nothing in the provisions of the constitution, or in the general provisions of government, that will justify the assumption of such superior authority." * * * "I think that all persons must admit that this is the rule of the common law. How is it then that this Court is to dispense itself from the enforcement of this rule so clearly established and so ancient. My general conclusion, then, is, that both upon the ground of public policy; and upon the well settled rules of law, the copy of a bill attested in the manner above mentioned and filed, is the conclusive proof of an act."

After the *Pangborn* case was decided a constitutional amendment was adopted which provided that no local or special bill should be passed without notice having been previously given.

Judge Van Sycle in *Chosen Freeholders vs. Stevenson*, 46 *N. J. L.* 173, said he fully concurred in the opinion delivered by the Chief Justice in the Pangborn case, but he noted the clear distinction between the constitutional provisions involved in the two cases. He said:

"After this (Pangborn) decision had been promulgated the constitutional amendment now involved was adopted. It must be presumed to have been carefully drawn to effect a well considered object. The members of the commission had before them the then existing clauses of the constitution, which have been adverted to, and well knew the interpretation they had received. If they had intended that the legislature should be the final arbiter, that end would have been attained under the construction adopted in *Pangborn vs. Young.* * * * The superadded

words in an instrument subjected to the most careful consideration of many legal minds, and so deliberately adopted as a constitutional amendment, must be presumed to have been used for a purpose, which, without them, would not have been expressed."

The conclusion reached by the Court, was that a certain bill of which notice had not been given as the constitution required, was not constitutionally passed, and the act was, therefore, void.

It would be difficult to conceive of reasoning more applicable to the cases at bar, or more strongly supporting the journal entry doctrine, where the constitutional provision is  mandatory, as in this State.    It is very significant that a New Jersey Court, while approving the decision in the *Pangborn* case, which was of course based upon the constitutional provision there involved, distinctly held that the enrolled bill would not be conclusive of the validity of the act, if a mandatory requirement of the constitution was disregarded, and the constitution provided what should be the evidence of a compliance with such requirement, and how such evidence should be preserved.

We have given so much attention to the *Pangborn* case because it is the leading, and strongest, case cited in support of the English or common law rule; because it is the case upon the reasoning of which the contestants mainly rely, and also because it is the authority upon which practically all the decisions that uphold the same rule are founded.

It would seem unnecessary, therefore, to comment upon any of the other authorities cited.    But we will briefly refer to the two  already  mentioned.

After *Pangborn vs. Young*, the case perhaps most frequently cited in support of the enrolled act doctrine is *Field vs. Clark*, 143 *U. S.* 649.    The opinion in that case was delivered by Justice Harlan, who after reviewing the decisions at considerable length, decided that the enrolled act must be taken as conclusive under the Federal constitution, which provides that each house shall keep a journal of its proceedings, and from time to time publish the same, and the yeas and nays of the members of each house, on any question shall, at the desire of one fifth of those

present, be entered on the journal. But the learned judge in the course of his opinion said:

"In regard to certain matters the constitution expressly requires that they shall be entered on the journal. To what extent the validity of legislative action may be affected by the failure to have these matters entered on the journal, we need not inquire. But it is clear that, in respect to the particular mode in which, or with what fullness, shall be kept the proceedings of either house relating to matters not expressly required to be entered on the journals, * * * these and like matters were left to the discretion of the respective Houses of Congress."

This case, decided in the highest Court of the country, is in no sense an authority against the journal entry doctrine, where "the constitution *requires* that the matters shall be entered on the journal." The learned Justice notes the difference between such a case and the one before him, and carefully refrains from expressing any opinion thereon. Manifestly it might have been different.

We think the decision in the Field case clearly explains and distinguishes many of the cases which apparently uphold the enrolled act doctrine. In almost all of them the constitutional provision involved did not expressly require that the matter should be entered on the journal, and they are not in point here. They held exactly what this Court would hold if we were deciding the case under the old constitution. It did not require that the yeas and nays should be entered on the journal before the bill could be passed, and the enrolled bill was then conclusive of the validity of the act.

The case of *Sherman vs. Storey*, so frequently cited as an authority sustaining the enrolled act doctrine cannot be regarded as of much value because the California constitution, at the time of that decision. was entirely different from ours. Judge Sawyer, in the course of his opinion said, "It remains to be seen whether there is anything in our constitution or laws requiring or authorizing a departure from the common law rule. * * * There is nothing requiring the yeas and nays to be entered in any case except at the option of three members." The same Judge, in a

later case, *Railroad Tax cases*, 13 *Fed. Rep*. 722, when sitting in the U. S. District Court, used the following language:

"While we think the case of *Sherman vs. Storey* was correctly decided under the constitution as it then was, we are of the opinion that the change in the constitution requires a change in the rule. When California adopted from other States the provision now found in its constitution substantially as found in the constitution of Illinois, it must be deemed to have adopted with the provision, the settled construction put upon it by the Courts of the State from which it was taken."

It is true that the later case of *Yole Co. vs. Colgan*, 132 *Cal*. 265, re-affirms the doctrine upheld in the case of *Sherman vs. Storey*, but the California constitution, even as amended, does not contain the mandatory provision, "that no bill shall be passed unless the yeas and nays are taken and entered on the journal."

Missouri was formerly classed as one of the State's supporting the English rule, and properly so, because in the constitution under which the earlier cases were decided there was no such mandatory provision as is contained in our own. For that reason the leading case of *Pac. R. Co.* 23 *Mo*. 353, so often cited in support of the enrolled act doctrine, cannot be regarded as an authority against the American rule, and, this clearly appears from the opinion of the Court in the later case of *State vs. Mead*, 71 *Mo*. 266, in which a mandatory provision of the constitution then in force was involved.

In the last mentioned case the Court said: "As if with the advance toward a higher civilization greater precautions were requisite in legislative matters than in the early days of our State's history. * * * The intimation is given in *Bradley vs. West* that the legislative journals might, in proper circumstances, be received in evidence to show that a law had not been passed in accordance with the constitutional requirements. The great current of authority is certainly in favor of such evidence for such purpose, and that the journals may disclose such a state of facts as will warrant the Courts in holding a statute. * * * *Cooley Const. Lim.* 135 and 136 and cases cited. We have no question but that this view is the correct one."

But why make further reference to cases cited as opposed to the journal entry rule? No decision can be of any weight as an authority unless it is based upon constitutional provisions similar to those involved in the case at bar. We are very confident that no decision can be found in any State, which holds the enrolled act conclusive, if the constitutional provisions respecting the journals, and the passage of the act, are similar to those contained in the constitution of this State. We are clearly of the opinion that the North Carolina Court in the Union Bank case correctly stated that no Federal or State authority can be found in conflict with those decisions which uphold the journal entry doctrine where the constitution requires not only that the yeas and nays shall be taken, but also that they shall be entered on the journal before a bill can be passed, or become a law. The Courts of New York, Pennsylvania, Massachusetts and some other of the older States have never ruled upon such questions. They have no such constitutional provision.

We are equally confident that no State, having such a constitutional requirement, and having adopted the journal entry rule, has receded from that position. The tendency is towards the American rather than the English rule, as appears from the cases cited from North Carolina and Missouri, and the many cases in other States. In the case of *Ramsey County vs. Heenan*, 2 *Minn.* 281, the Court, in speaking of such a constitutional provision, said: "If it is only directory, it is senseless, but if held to mean what it imports, it is an advance in the science of government worthy of imitation by all States and countries whose legislatures are not absolute." The later cases in the same State are to the same effect.

In *Rode vs. Phelps*, 80 *Mich.* 598, Judge Morse said: "And it is noticeable—that many of the States which formerly held a different doctrine from that laid down by this Court, have since, under constitutions similar to ours, which require that all bills shall be passed by a yea and nay vote of record, admitted the right and duty of the Courts to go behind the official authentification of the law, and inquire into the manner and methods of its adoption, to ascertain whether or not it was properly and legally

passed, as required by the constitution." Judge Morse cites a number of modern decisions in support of his assertion.

In *Simpson vs. Union Co.*, 110 *Fed. Rep*. 799, Judge McPherson declared, "It is now settled beyond all debate that a printed official statute must give way to, and be controlled by, the official enrollment; and it is equally well settled, and as free from debate, that both the official printed statute, and the enrolled bill as filed with the Secretary of State, must be controlled and determined, in case of dispute, by the journals of the legislature and the records in fact made."

Even in the State of New York, which has no such constitutional provision as ours, and has not been classed as a journal entry State, it has been held that the tendency of judicial authority supports the proposition that whenever a question arises as to the constitutionality of a statute, the Court may resort to any source of information which in its nature is original evidence of any fact relevant to the inquiry." *The People vs. Petrea*,92, *N. Y.* 128. Unquestionably the tendency in this country is away from the English, and towards the American rule.

It cannot we think be seriously questioned that the journals of the legislature, required to be kept and published under constitutional provisions similar to our own, are public records of which the Court may take *notice so far as those matters are concerned which the constitution requires to be entered thereon*. Authorities are perhaps not needed to support such proposition, but we will refer to a few. In the case of *People vs. Mahoney*, 13 *Mich*. 481, decided by Judge Cooley, parts of the syllabus are as follows:

"Judicial notice. Courts are bound to judicially take notice of what the law is, and to enable them to determine whether the constitutional requisites to the validity of a statute have been complied with, it is their right, as well as duty, to take notice of the journals of the legislature. No plea is necessary to bring to the notice of the Court facts which the judges must judicially know, and in respect to which no proof could be given."

In *McDonald vs. State*, 80 *Wis*. 407, the Court said: "The Courts will take judicial notice of the statute laws of the State,

and to this end they will take like notice of the contents of the journals of the two houses of the legislature far enough to determine whether an act published as a law was actually passed by the respective houses in accordance with constitutional requirements."

We think that by the great weight of authority in this country to-day, as well as by reason, and a public policy which demands the enforcement of constitutional provisions, the Courts may, and should, notice, or look to the journals of the legislature for the purpose of impeaching a duly enrolled act when the constitutionality of its enactment is challenged; that when a State constitution contains a provision that no bill shall become a law, or that no bill shall pass unless the yeas and nays are entered on the journal, such provision is mandatory and must be enforced; and if it clearly and affirmatively appears from an inspection of the journals that such mandatory provision has not been complied with in the passage of an act; or if the journals fail to show that such provision has been complied with, it is the duty of the Court to declare such act void.

In the case of Cohn vs. Kingsley, 38 L. R. A. (Idaho) the majority of the Court held, that by reason of a provision in the constitution of that State requiring each house to keep a journal of its proceedings, "the journal becomes, not only the best evidence, but the exclusive evidence, of what was done by the house keeping such journal, and Courts must impute to the record and statements in the journal absolute verity. * * * The authorities cited to establish the rule that mere silence of the journal to show that a certain thing was done does not prove that it was not done, we apprehend, arose under constitutions in many respects unlike ours. An examination of the authorities cited by the respondent to support this contention seems to limit the rule to those acts which the constitution does not require to appear in the journal. But our constitution clearly intends that all of the proceedings of each house shall appear in the journal. Hence we must presume that everything done by each house, all of its proceedings, and nothing else, appear in the journal."

This position has been taken by a number of the States supporting the journal entry rule, but we are not required to go so far. Our constitution not only requires each house to keep a journal of its proceedings, but that the yeas and nays be entered on the journals.

Chief Justice Sullivan delivered a dissenting opinion in the above case, and we quote a part of his opinion because he clearly states the true rule in respect to *silence of the journals*, and shows the distinction between many of the cases in this regard.

He says: "The weight of authority under constitutions similar to ours, so far as I have examined, is that, unless the journal affirmatively shows that some requirement of the constitution in the passage of a bill has been omitted, the presumption is that such requirement has been complied with although the journal be silent in regard thereto, except where the constitution commands such act to be entered on the journal. For example, where the constitution declares that on the final passage of a bill the vote must be by yeas and nays, and entered on the journal, in such a case the act would he held invalid if the journal failed to affirmatively show that such vote was taken and entered as commanded by the constitution." * * *

"My conclusion is that a law passed by the legislature should not be held invalid because of the fact that the journals fail to show that each and every act required by the constitution to be done in the passage of such law had been done, unless such act or proceeding is expressly commanded by the constitution to be entered on the journal. As, for instance, the vote on the final passage of a bill is commanded by the constitution to be taken by yeas and nays, in such case the Court would have jurisdiction to hold such bill invalid, and should do so. But if the journal was silent as to the printing of the bill, and the three several readings in each house, and of the adoption of an amendment by yea and nay vote; as those acts are not expressly commanded to be entered in the journal, the presumption would be that those necessary acts were done, and such bill held valid. Otherwise if the journal fail to show the final passage of such bill by a yea and

nay vote, as the final passage of a bill is expressly commanded to be by yeas and nays and entered on the journal."

This, we think is a clear and correct statement of the law, which is reasonable and safe. It aptly covers the cases before us, and we are convinced that few, if any, decisions can be found in conflict therewith. Many can be found inconsistent with the ruling of the majority of the Court, but none, we believe, that is opposed to the rule approved by the Chief Justice.

This statement of the law disposes of many of the authorities cited by the contestants, for the reason that the questions involved therein were different from the one here.

It cannot be necessary to multiply authorities upon the point, that the Court may, and should, take notice of the journals so far as to determine whether the legislature, in the passage of an act, has done those things which the constitution requires to be done, and also requires the journals to show. The constitution, as to such matters, has made the journals the record evidence, and it must be the ultimate and conclusive evidence. Indeed, we do not know of any decision to the contrary, based on constitutional provisions like ours.

The following are only a few of the many authorities that fully sustain our position:

*Ex Parte Howard-Harrison Iron Co.*, 24 *La.* 519 (*Ala.*); *Hughes vs. Felton*, 19 *Pac.* 444; *State vs. Green*, 18 *La.* 224; *State vs. Hocker*, 18 *La.* 767; *Cohn vs. Kingsley* (*Supra*); *Spangler vs. Jacoby*, 14 *Ill.* 298; *McCullough vs. State*, 11 *Ind.* 524; *Koehler vs. Hill*, 60 *Iowa* 543; *Division of Howard County*, 15 *Kan.* 194; *Atty. Gen. vs. Rice*, 64 *Mich* 385; *Sagkinder vs. Saginaw Co.*, 79 *Mich.* 59; *Atty. Gen. vs. Supervisors*, 89 *Mich.* 552; *Opinion of the Justices*, 35 *N. H.* 579; and 45 *N. H.* 607; *Simpson vs. Union Co.*, 110 *Fed. Rep.* 799; *Union Bank vs. Oxford*, 119 *N. C.* 214; *Ritchie vs. Richards*, 14 *Utah* 345; also *Cooley's Constitutional Limitations*, and *Sutherland on Statutory Construction*, (*Supra*); *State vs. Robinson*, 20 *Neb.* 96.

Nowhere, perhaps, has the law been more concisely and clearly stated upon this question than in the above mentioned

case of *State vs. Hocker*, 18 *So.* 767 (*Fla.*), in which the Court said:

"Acts of the legislature duly enrolled and signed by the officers of the two houses, and filed in the office of the Secretary of State, with the approval of the Governor thereon, are *prima facie* valid and authoritative laws; but the journals of the two houses that enacted them may be resorted to, to ascertain whether the mandatory requirements of the constitution have been complied with by the legislature in their enactment; and if such journals show, explicitly, clearly and affirmatively that any essential constitutional requirement has not been complied with, or if they fail to show any essential step in the process of enactment that the constitution expressly requires them to show,—such for example, as the entry of the ayes and nays upon the final passage of any bill in either house,—then such journals would prevail as evidence, and the enrolled bill, as evidence of the law, would have to fall,—*State vs. Brown*, 20 *Fla.* 407."

This is unquestionably the law in almost every State where *such a question* has been expressly ruled upon. And such a construction is most reasonable and logical, because, if the journal entry doctrine is to prevail, then when the journal clearly and plainly speaks respecting a matter required by the constitution to be entered thereon, it must be taken as conclusive of the fact of which it speaks. It is a high, constitutional record, kept under the supervision of the entire body of the legislature and it is illogical to say that the enrolled bill may be impeached by the journals, and that the journals in turn may be impeached by some other evidence not constitutional and of much less sanctity. In the case of *Ritchie vs. Richards* (*Supra*), the Court said:

"The provision that the names of those voting shall be entered upon the journal, in connection with the requirement that the vote shall be taken by ayes and nays, and in the same section with the limitation upon legislative power to pass any law, must be considered as intending to subserve a more important purpose than that of simply indicating how any particular member voted. The design was clearly to perpetuate a record or evidence of the fact that the act was passed in strict accordance

with the fundamental law. No Court disputes the proposition that the legislature is powerless to enact a law in violation of the constitutional requirements, and that no bill becomes a law if in fact it was not passed by the legislature. The divergence of views arises concerning the character of the evidence which may be accepted in the determination of that question. The English decisions, and those of some of the States, denying any right to consult the journals, are not in point, owing to a radical difference between the record authority of the journals of parliament, and of the legislatures of such State, and legislative journals under a constitution like our own. Here the journals are not kept merely in the interest of orderly procedure, but they exist in obedience to a constitutional command, and the nature of their contents is, to some extent, prescribed. As it is the peculiar province of the Courts to pronounce upon the validity of legislative enactments, they should possess authority to have recourse to the constitutional record of legislative procedure, in so far, at least, as that record is constitutionally required to make disclosure. Our conclusions are, therefore, that we have the authority, and it is our duty, to examine the journals, to determine whether or not the act in question was passed by a majority of the members elected to each house, that being a matter which the constitution requires to be shown by the journals."

In the case of *Spangler vs. Jacoby*, 14 *Ill.* 298, the Court said:

"The vote must be also entered on the journal. The office of the journal is to record the proceedings of the house, and authenticate and preserve the bill passed by a constitutional majority. These directions are clearly imperative. They are expressly enjoined by the fundamental law, and cannot be dispensed with by the legislature. The constitution requires each house to keep a journal, and declares that certain facts, made essential to the passage of a law, shall be stated therein. If these facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the house, and is presumed to contain a full and complete history of its proceedings. If a certain act received the constitutional assent of the body, it will so appear on the face of its jour-

nal.  And when a contest arises as to whether the act was thus passed, the journal may be appealed to, to settle it.  It is the evidence of the action of the house, and by it the act must stand or fall.  It certainly was not the intention of the framers of the constitution that the signatures of the Speakers and the Executive should furnish conclusive evidence of the passage of a law. The presumption, indeed, is that an act thus verified became a law pursuant to the requirements of the constitution; but that presumption may be overthrown.  If the journal is lost or destroyed, this presumption will sustain the law, for it will be intended that the proper entry was made on the journal.  But when the journal is in existence, and  it fails to show that the act was passed in the mode prescribed by the constitution, the presumption is overcome, and the act must fall."

In the case of *Fordyce vs. Godman*, 20 *Ohio St.*, the Court in speaking of the legislative journals as evidence, used the following language: "This entering of the yeas and nays upon the journal must have been intended to furnish the permanent evidence of the State of the vote so recorded.

"And were we to hold otherwise, we would in effect hold that a bill may become a law without receiving the number of votes required by the constitution; that a single presiding officer may by his signature give the force of law to a bill which the journal of the body over which he presides, and which is kept under the supervision of the whole body, shows not to have been voted for by the constitutional number of members.  The plain provisions of the constitution are not to be thus nullified, and the evidence which it requires to be kept under the supervision of the collective body, must control, when a question arises as to the due passage of a bill."

Judge Coolley says, "that no plea is necessary to bring to the notice of the Court facts which the judges must judicially know." If they must judicially notice the journals, they need not be proved—"no proof could be given."

Certain cases can be found in Illinois, apparently to the contrary, but they are all based on the case of *Illinois Cen. R. R.*

*Co. vs. Wren*, 43 *Ill.* 79, in which the Court declared that "although for some purposes we may take judicial notice of the legislative journals," they were not required to notice the journals unless they were introduced in evidence in the Court below, and the matters brought to their attention; that they would not take the trouble to explore the journals to ascertain the facts.

But the Supreme Court of the United States, in the case of *South Ottawa vs. Perkins*, 94 *U. S.* 260, on appeal from the U. S. Court for the Northern District of Illinois, (Mr. Justice Bradley delivering the opinion), said: "When once it became the settled construction of the constitution of Illinois that no act can be deemed a valid law, unless, by the journals of the legislature it appears to have been regularly passed by both houses, it became the duty of the Courts to take judicial notice of the journal entries in that regard. The Courts of Illinois may decline to take that trouble, unless parties bring the matter to their attention, but on general principles, the question as to the existence of a law is a judicial one and must be so regarded by the Courts of the United States."

The Court, after quoting the rule laid down in *Gardner vs. Collector* and hereafter mentioned, further said: "Of course, any particular State may by its constitution and laws, prescribe what shall be conclusive evidence of the existence or non-existence of a statute."

That is what we believe the State of Delaware has done in and by its last constitution; and it may be noted that there is one provision in that constitution which the constitution of Illinois does not contain, viz.: that no bill shall be passed unless the yeas and nays are called and entered on the journal.

A few of the States which uphold the journal entry doctrine seem to permit other evidence than the journals to be considered for the purpose of ascertaining whether the act in question was constitutionally passed; but we cannot see how such a position can be sustained upon principle or authority, if the fact to be determined was required by the organic law to be entered on the journals.

Opinion.

The Courts in such States have professed to follow the rule laid down by Mr. Justice Miller in the case of *Gardner vs. Collector*, 6 *Wall.* 499, which he stated in the following language: "We are of opinion, therefore, on principle as well as authority, that whenever a question arises in a Court of law of the existence of a statute, or of the time when a statute took effect; or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such questions; always seeking first for that which in its nature is most appropriate, *unless the positive law has enacted a different rule.*"

We do not in any wise dispute the soundness or propriety of such rule, but think it is sometimes misconstrued, misunderstood or misapplied. There are many things noted on the journals which are not expressly required by the constitution to be entered, and as to such things the journals may furnish no better evidence than can be found elsewhere, and may therefore be contradicted, or explained, by other competent and appropriate evidence satisfactory to the judicial mind.

We think it will be found that whenever in those States which have approved the journal entry doctrine, the Courts have had resort to the original bill, or other records than the journals, it was not for the purpose of ascertaining whether the yeas and nays were taken and entered when the journals clearly showed they were not, but rather for the purpose of determining some other fact or thing that could be shown by the original bill or other record evidence, and which was not required to be shown by the journals. This, we think, is what Mr. Justice Miller meant and all he meant, when he declared the rule above quoted, for he qualified his declaration by saying that the Courts should "always seek first for that information which in its nature is most appropriate, *unless the positive law has enacted a different rule.*"

In this State the positive law, the organic law, has enacted a different rule for ascertaining whether the yeas and nays were taken on the final passing of a bill, and that is, an examination of the legislative journals, where, and where only, the yeas and nays

Opinion.

are required to be entered and where they must appear if they were taken. They are not only the strongest and most appro-priate evidence, but necessarily the only evidence that can es-tablish the fact to be determined. The yeas and nays are not required to be entered anywhere else, and are not in fact entered on the original bill.

It is contended by the contestants that if resort may be had to the journals for the purpose of ascertaining whether an act has been constitutionally passed, it may be had also to the original bills, the endorsements thereon, and also to other records or dockets kept by the clerks, speakers or other officers of the legislature.

In reply to such contention we say:

1. If the position we have taken is correct, viz.: That the journal is conclusive as to those matters which the constitution requires to be entered therein, then nothing outside the journal, and not constitutional in its character, can be used to contradict the journal.

While some States have resorted to other sources of infor-mation than the journals when it was doubtful from the journals whether the act was constitutionally passed, it is otherwise when the fact in dispute is clearly established by the journals, and is required by the constitution to be entered thereon.

In the case of *Strauss vs. Heiss*, 48 *Md.* 292, in which the Court quoted with approval the rule announced by Mr. Justice Miller, the question was, which one of two acts was first approved by the Governor. Manifestly that was something which was not required to be, and could not be, shown by the journals. The case cannot, therefore, be regarded as opposed to the conclusive-ness of the journals respecting those things of which they are required to speak.

But even though the original bills might be examined how could they show a compliance with the important, the essential constitutional requirement, to-wit: the entry of the yeas and nays on the journal? How could such compliance be shown ex-cept by the journals themselves? Would it be possible to show by other records or dockets that a certain entry was made in the

Opinion.

journal when the journal is in existence and clearly shows it was not so made? Suppose the clerk or speaker had made some entry somewhere which stated that the yeas and nays were taken and entered on the journal, but the journal is present and contains no such entry? Could such outside entry possibly show a compliance with the constitutional requirement that the yeas and nays shall be entered on the journal? We think not.

2. If any records and dockets kept by the clerks, speakers or other officers of the legislature may be examined for the purpose of ascertaining whether the yeas and nays were taken and entered on the journals, how could the validity of the act ever be definitely determined? It would cause hopeless confusion; and make the constitutionality of statutes more doubtful than ever before. The Courts, as well as the people, would be at sea for lack of any certain test or guide in determining their validity.

Certainly no statute, rules of legislative procedure or custom, can be so high and controlling as an express constitutional provision. The General Assembly is not authorized to substitute any action or procedure which shall take the place of that means which the constitution clearly intends to be considered as the best evidence for the determination of the question whether a bill actually passed both houses in the manner required by the constitution. The constitution, in all matters concerning which it speaks, is the ultimate authority. No argument from inconvenience, or from consequences of judicial action can be considered when the clear provisions of the constitution point the way to a determination of the question.

There is a particular ground upon which it is insisted that evidence outside the journals may be resorted to. It is this,—that when the journal entries leave it doubtful which one of two bills was constitutionally passed, then the original bills, with the endorsements thereon, and any other notes or memoranda made by the clerks or other officers, may be examined, not for the purpose of contradicting the journals, but to explain them. In other words, it is contended that such evidence may be used to establish the identity of the bill that was constitutionally passed.

But such a position is not only untenable, but unnecessary, under the journal entry rule. If the journals leave such a doubt as requires, or admits, of explanation, then the presumption in favor of the enrolled bill is not rebutted, and it must he held valid.

Do the journals leave any such doubt? If they clearly show that it was the original senate bill, and not the substitute, upon which the yeas and nays were taken and entered on the journals, then any evidence outside of, or *aliunde*, the journals, and outside of the record, which would show that it was the substitute, and not the original bill, would contradict the journals.

This cannot be done under our view of the law; is not permitted in any of the States where the journal entry doctrine prevails, and where the constitutional requirements are like our own. Recognizing, as we do, such doctrine, we hold that the journals must furnish the ultimate and conclusive evidence of a compliance by the legislature with the constitutional requirements in the passage of an act, so far as said requirements are required to be entered upon, and shown by the journals. And this is a reasonable, safe and certain rule. It will create no confusion, and impose no hardship in ascertaining whether an act was constitutionally passed or not. If the yeas and nays were called, and a majority of the members elected to each house voted in favor of the bill, the journals will show it, because the yeas and nays are required to be entered for that purpose, and are not required to be entered anywhere else. And if they fail to show it, such failure is conclusive proof that the bill was not constitutionally passed.

And now, without reference to the authorities, and without regard to the many decisions cited, let us briefly consider what was the manifest purpose of the provision in our constitution, and what its language means.

The provision in the old constitution was directory. Why should the makers of the new constitution have made such a radical change as to make it mandatory, by providing that no bill shall be passed unless the yeas and nays were taken upon its final passage and *entered on the journal*? There was no such provision in the old constitution. The convention that made the

24 Del.]     Rash vs. Allen; Ross vs. Allmond.          491

Opinion.

new constitution was composed of intelligent men, many of whom were able lawyers. They had before them the provision in the then existing constitution, and must be presumed to have understood its meanings? They knew that under the old constitution the enrolled act was conclusive. If they intended that it should continue to be conclusive such end would have been attained under the old provision. Why should they have incorporated the mandatory words in the new? It must be presumed to have been carefully drawn to effectuate a well considered object, and that it was intended thereby to make a change in the manner of passing laws.

It is reasonable to assume that the framers of the present constitution believed that there was good reason for such a change as they made. It was evidently their purpose not only that thereafter no bill should become a law unless the yeas and nays were called and a majority of the members voted in its favor, but that the conclusive evidence of such fact should not be the certificate of the speakers, or the endorsements and notes of clerks or other officers, which were not supervised by the body, but the journal itself, which was kept or made under the supervision of the entire body. To that end they provided that the evidence of a compliance with their mandate should be furnished by, and preserved in, the journal. Does it not then seem unreasonable to say that such constitutional evidence when it is clear, may be overcome, or contradicted by other evidence which is not required by the constitution or laws to be kept for such purpose?

It is fair to assume that it was intended by such mandatory provision to do away with the old English or common law rule of the unvoidability of the enrolled act, and that the journals should be the conclusive evidence of the fact that a bill had or had not been passed. Any other construction would make such mandatory clause a useless formality.

The makers of the present constitution meant that the organic law, and not the legislative power, should be supreme; and that a safe and sound public policy demanded that there should be some means fixed by which the legislative will could be

ascertained, and some method provided by which a wise and prudent constitutional limitation could be enforced.

When the constitution provides that no bill shall pass either house unless the final vote shall be by yeas and nays and the names of the members voting for and against the same shall be entered on the journal, nor unless a majority of all the members elected to each house shall concur; and further expressly provides for the keeping of that journal and the publication of the same immediately after every session of the General Assembly, can there be any doubt that the constitution thus intends to provide, and clearly does provide, for the preservation, in this form, of the evidence to establish whether that which may be represented to have become a law did in fact pass both houses of the legislature, and is a valid and binding statute? By requiring the evidence to be entered on the journal, and carefully providing for its preservation, the framers of the constitution must have intended that it should be regarded as the best evidence to establish the fact of a bill's constitutional passage.

Our conclusion upon this branch of the case, is that when the constitution of a State contains a provision that no bill shall pass unless the yeas and nays are entered on the journal, such provision is mandatory and not directory, and must be enforced by the Courts, and when it appears by an inspection of the journals that such mandatory provision has not been obeyed or complied with, the Courts should not hesitate in declaring the act invalid. We are clearly of the opinion that the provision in the constitution of this State respecting the entry of the yeas and nays is of such mandatory character, and that it is the duty of the Court to declare the act in question void if it clearly and satisfactorily appears from the journals that such provision was not complied with in the passage of the act in question.

Does it so clearly and satisfactorily appear?

From a careful examination of the legislative journals it appears that Mr. Sparks gave notice February 15, 1907, that he would aske leave on some future day to introduce a certain bill. Subsequently, on motion of Mr. Sparks, Senate bill 142 was read a first time, the title thereof being as follows: "An Act to amend

*Section* 31, *Chapter* 207, *Volume* 17, *Laws of Delaware*, being an act entitled 'An Act to revise and consolidate the statutes relating to the City of Wilmington by providing that the Council of the Mayor and Council of Wilmington shall have power and authority to amend, revise or repeal the charter of the said the Mayor and Council of Wilmington.' " This is substantially the same title as mentioned in the notice previously given by Mr. Sparks. Under a suspension of the rules the bill was read a second time and referred to the Committee on Cities and Towns. This bill we will hereafter call original Senate bill Number 142.

Later Mr. Sparks, on behalf of said committee, reported favorably to the Senate, as Senate substitute for Senate bill Number 142, a bill with the following title. "An act to amend an act entitled 'An Act to alter and re-establish the statutes relating to the City of Wilmington, passed at Dover, March 15th, 1907,' by providing when city officers of the City of Wilmington shall be elected and appointed."

This bill we will hereafter call Senate Substitute for Senate bill Number 142, or Chapter 178, Volume 24, Delaware Laws. The next entry shown by the Senate journal relates to the third reading and final passage of the bill upon a yea and nay vote. Here the important question arises—what bill was then voted on and passed? Was it Senate Substitute for Senate bill Number 142, as the contestants contend, or an entirely different bill, viz.: Senate bill Number 142? There is nothing in the journal from which this can be determined but the title of the bill.

The Constitution of this State, *Section* 16, *Article* 2, provides that "no bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title." Therefore, with the subject of the bill expressed in its title, and with the title of the bill entered on the journals, we have a fair and intelligent record of what the legislature did; and we have a right to assume, in the cases at bar, that the title of the bill which we find entered upon the journal of each house, fairly and correctly expressed the subject, or character, of the bill that was constitutionally passed.

And just here we may say that the case of *Larrison et al. vs. Peoria &c. R. R. Co.*, 77 *Ill.* 11, cited by the contestants as very similar to those at bar, is not so, for the reason that there was in that case but a slight difference between the title of the bill introduced and twice read, and the title of the bill reported by the committee and passed. The Court was clearly of the opinion that the entries on the journal referred to the same bill, and such conclusion was perhaps warranted by the facts in the case. In the cases before us the journals present a very different state of facts, and such as would not justify a similar conclusion.

And it may be also noted that the three several readings of the bill, which was the question at issue in the Illinois case, was not something that was required by the constitution of that State to be entered on the journals; nor was the subject of the bill required to be expressed in its title.

The bill taken up for final consideration upon motion of Mr. Sparks, and constitutionally passed, bore the title of the original Senate bill Number 142, which, as we have said, was altogether different from the Senate substitute.

The Senate journal further shows that the house concurred in the same bill. The Senate committee on enrolled bills reported as duly and correctly enrolled a bill bearing the title of the Senate substitute for Senate bill Number 142. The house returned to the Senate as duly and correctly enrolled, and signed by the Speaker of the House and President of the Senate a bill bearing the same title.

The House journal shows the same procedure with respect to the two bills, except that the bill reported by the House committee was Senate bill Number 142, and bearing the title of the original Senate bill.

It therefore affirmatively and indisputably appears from the journals of each house that the yea and nay vote was taken upon a bill which bore an entirely different title from that of the the bill which the contestants claim was passed. That is, that the bill which was constitutionally passed was the original and not the substitute; and it is admitted that only one of the said bills was passed.

It must not be forgotten, of course, that there were two bills, in the Senate, both of which should be considered in determining which was in fact passed. And we must assume that while but one bill—the substitute—was formally reported by the committee in the Senate, both bills in some way, got out of the committee and before the Senate, because otherwise both titles could not have been subsequently used. Can this Court conclude, or assume, that notwithstanding the fact both journals state that the yea and nay vote was taken on the original bill, as a matter of fact it was taken on the substitute bill? What is there in the journal of either house to support such an assumption? Does it appear from the journal of either house that the constitutional requirement was obeyed in the passage of the substitute? Does it appear that it was passed at all? Certainly not unless the journal entry respecting the title of the bill upon which the yea and nay vote was taken was a mistake, and the true or correct title was that of the substitute bill.

But what is there in the journals to support such a theory or contention? The entries in the Senate journal respecting the substitute bill show: (1) That it was reported out of committee; (2) that it was reported duly and correctly enrolled, and (3) that it was returned to the Senate by the House as having been signed by the Speaker of the House and the President of the Senate. It does not appear that any action whatever was taken on that bill in the Senate after it was reported from the committee.

It appears from the House journal, only that the substitute bill was reported as duly and correctly enrolled, signed by the President of the Senate, and ready for the signature of the Speaker of the House.

On the other hand it does clearly appear from the Senate journal that the original bill was given notice of, was read a first and second time, was referred to the proper committee, was voted on by yeas and nays, which were entered on the journal, was sent by the Senate to the House, and was returned to the Senate by the House as concurred in by the House. And from the House journal it appears that the original bill, which had

passed the Senate, was sent by the Senate to the House, was read a first and second time and referred to the proper committee, was reported out of committee and passed by a yea and nay vote which was entered on the journal. Notwithstanding such a clear showing by the journals, it is argued by the contestants that it was the substitute bill, and not the original bill, that was passed, for the following reasons.

1. That there was but one bill, and that the substitute, that was reported by the Senate committee; and therefore there could have been but one bill pending before, and acted upon by either House, which must have been the bill the Senate committee reported, to-wit: the substitute bill.

But a sufficient answer to this argument would seem to be that the original bill, as well as the substitute, was in the possession of each house, or the clerk thereof, after the Senate committee reported the substitute bill, else the clerks could not have had the title of the original before them. We do not know how the original bill got out of committee, neither do we propose to guess or speculate about it. Even if the original bill came to the clerks, or before the Houses, inadvertently or improperly, it would be entirely immaterial. The material point, is not whether the original bill was reported by the committee, but whether it was the bill that was voted on and constitutionally passed. For, if it was, then certainly the substitute was not, and therefore the latter never was passed, or became a law, as the journals distinctly and clearly show.

2. It is argued that the fact that the committee on enrolled bills in each House reported the substitute, and not the original bill, as duly and correctly enrolled, is strong evidence that it was the substitute, and not the original bill that was passed.

This is practically the same as saying that the enrolled act doctrine should prevail, for it adds nothing whatever to the presumption that always obtains in favor of the validity of the enrolled bill. We have already discussed that feature of the case at length, and need not repeat it here.

But let us consider for a moment the enrolled bill simply as to its evidentiary value to show that the bill which was passed

was not the bill which the journal of each house states was passed, but the bill that was reported as duly and correctly enrolled.

Assuming that the enrolled bill properly signed and approved is not conclusive of its constitutional enactment, it certainly will not be contended that the enrollment is of itself sufficient evidence of such enactment, If it does not appear from the journals that a yea and nay vote was taken upon the bill how can the enrolled bill establish the fact? It is true that in this case the committee on enrolled bills in each house reported the Senate substitute as duly and correctly enrolled, and that the House returned to the Senate such enrolled bill signed by the Speaker of the House and the President of the Senate. But of what value are such facts standing alone, when we have the affirmative statement in the journal of each house that the bill actually voted on and passed was an entirely different bill, to-wit: the original Senate bill Number 142?

It is also true that both the original and the substitute bill bore the same number—142—,and because of this fact it is argued that inasmuch as the bill that was passed, and the bill that was enrolled, bore that number, it is fair to assume, that it was one and the same bill. There would be some strength and plausibility in this argument if the similarity in the number proved the similarity in the chartcter of the bills. But we know, as matter of fact, that the two bills, although having the same number, were essentially different in character. The subject embraced in the one was entirely different from the other. One was a substitute for the other, and either was complete without the other. The fallacy of the argument of the contestants upon this point is found in the fact that a vote on Senate bill Number 142 is consistent with a vote on the original bill, but not on the substitute. It will be remembered that the original bill was "Senate bill Number 142," whereas the substitute was "Senate Substitute for Senate bill Number 142." The vote, according to the journal of each House, was taken on the former, that is, on Senate bill Number 142.

We think we have considered all the arguments made by the contestants in their effort to show that the substitute was the

bill that was actually voted on and constitutionally passed, so far as those arguments are based on facts disclosed by the journals. We do not propose to notice any arguments that are not based upon such facts, nor shall we travel outside of the journal record to discuss facts or circumstances that might tend to show what the legislature must have intended to do, or probably did, or did not do. The important question, is not what the legislature may have intended to do, not what was the practice or usual course of procedure in the legislature as known to those familiar therewith; not whether the committee of the Senate reported the substitute bill alone, or with the original bill; not whether the clerks got the two bills mixed or confused; not whether they, in the rush of business at the close of the session, made a mistake in their journals by writing the title of the original bill when it should have been the title of the substitute bill, but rather what, *according to the journal entries*, was the bill upon which the yeas and nays were entered, the bill that was constitutionally passed? Was it the Senate substitute? If it was not, then it makes no difference whether the original bill was passed or not, because the bill in question was not constitutionally passed, and did not become a law.

In determining which of the two bills was passed, or rather, whether the substitute was passed, one of the very significant facts to be considered, is that the same entry respecting the bill that was passed appears on the journal of the House as on the journal of the Senate. If the title of the original bill was read by mistake, or inadvertently written, for the title of the substitute, is it not most remarkable that the same mistake should have been made in each house of the General Assembly?

And, if the substitute bill was the one that was in fact passed, is it not equally remarkakle that, nothing whatever was done with it, in the Senate, so far as the journal shows, after it was reported by the committee, until it was enrolled; and that in the House, so far as the journal of that body shows, it was not presented, read, reported by the committee or acted upon at all—no mention being made of it there until it was enrolled?

Bearing in mind the well settled and salutary principle of law that the constitutionality of a statute should be upheld by the Court if it is possible to do so, we have sought most diligently to find in the journals some evidence that would satisfy us, or from which it might be even presumed, that the substitute bill was the one that was passed; or which might at least raise a doubt as to whether it was the bill that was passed. But we have not been able to find such evidence. Indeed, after a careful examination of the journals we are forced to the conclusion that while the General Assembly may have intended to pass the substitute, they did in fact pass the original bill. And it clearly and satisfactorily appears, that on the substitute bill the yeas and nays were never taken and entered in the journals. The mandate of the constitutional provision under consideration touches a bill at one point, and one point only, before it reaches the Governor, and that is at its final passage—the yea and nay vote. The constitution does not require that a bill shall be reported by a committee, that it shall be enrolled, or signed by the presiding officers. These things are matters of legislative procedure, governed, for the most part, by the rules of the two houses. But the constitution does require that each house shall keep a journal of its proceedings, which shall be published, that a bill shall not pass either house unless the final vote shall have been taken by yeas and nays, and the names of the members voting for and against the same shall be entered on the journal, nor without the concurrence of a majority of all the members elected to each house.

If, therefore, anyone desired to ascertain whether a certain act was constitutionally passed or not, what would he do—where would he look? Naturally resort would be had to the legislative journals, and to that stage of the bill's progress through each house to which the constitutional provision applies—the final vote by yeas and nays. If he fails to find, as the result of such examination, that any act was constitutionally passed bearing a title similar to the one he seeks, he must conclude that such act was not passed in compliance with the mandatory requirements of the constitution, and is, therefore, invalid.

Of course, it is possible that it may sometimes appear from the journals themselves that a mistake was made therein respecting the title of a bill on the final vote, and that the bill actually passed was another bill, with an entirely different title. But we are clearly of the opinion that in the present case the journals not only do not show that such was the fact, but they leave no room for doubt. We, therefore, must conclude that Senate Substitute for Senate bill Number 142 was never constitutionally passed, and that the act published as *Chapter* 178, *Volume* 24 *of the Delaware Laws* is void.

The said act being invalid it necessarily follows that the election held thereunder was void; and that the City Council had no power or authority to hear and determine any contested election case growing out of such pretended election.

The judgments rendered by the Court below, must, therefore, be held void for want of jurisdiction.

It was insisted by the contestants at the argument that if the judgments in question were void, they were nullities, and cannot be reversed. But, we are clearly of the opinion that they can, and should be reversed.

The judgments were rendered by a tribunal in the exercise of judicial powers conferred by a statute of this State, and their execution or enforcement would have deprived the respondents of the offices to which they were certified as elected.

The rule of law applicable to this subject, and which has been recognized in many States, is that although a judgment given without jurisdiction may be regarded as a nullity, and impeached collaterally, still the Court on *certiorari* will perform what is the main object of a *certiorari*—the keeping of inferior Courts and tribunals within the compass of their powers; and will reverse judgments of inferior courts when they have proceeded without jurisdiction. Indeed, it seems to be the only means of accomplishing such object.

In the case of *Striker vs. Mott*, 6 *Wend.* 467, the Court said: "But it is said that if the Justice proceeded to try the issue involving the title, and acted without jurisdiction, the judgment is void and cannot be enforced, and that there is, therefore, no necessity

Dissenting Opinion.

for reversing it.    I see no way whereby the plaintiff can prevent the judgment from being carried into effect against him but by a reversal."

The principle is general that wherever any persons assume to act under a special and limited power conferred by law, their doings may be avoided by showing that they had no jurisdiction, or that they had exceeded the limits of their authority.    It may be regarded as settled, that though a party has a right to treat the proceedings of an inferior tribunal as nullities in a collateral proceeding, he may nevertheless maintain a *certiorari* to set them aside.

*The People vs. Judges of Suffolk Co.*, 24 *Wend.* 249; *Striker vs. Mott*, 6 *Wend.* 464; *Star vs. Trustees of Rochester*, 6 *Wend.* 564; *Carron vs. Martin*, 26 *N. J. L.* 549; *State vs. Richmond*, 26 *N. H.* 234; *Old Colony R. Co. vs. Fall River*, 147 *Mass.* 455; *Combs vs. Dunlap*, 19 *Wis.* 623; *Crandall vs. Bacon*, 20 *Wis.* 672; *State vs. Fowler*, 16 *So.* 565.

Having concluded that said *Chapter* 178 is void, and that the City Council claiming to have been elected by, and under the authority of, said act had no jurisdiction to hear and determine the said contests, it is not necessary for us to consider or pass upon any of the many objections made by the respondents to the legality or regularity of said proceedings.

In conclusion we say, that while said act, *Chapter* 178, *Volume* 24, *Laws of Delaware*, is invalid, and the city election held thereunder void, the members of the City Council and other city officers duly returned and certified as elected at said election, are nevertheless *defacto* officers.

It is ordered that this opinion be certified to the said Superior Court in and for New Castle County.

JAMES PENNEWILL, C. J.

WOOLLEY, J., with whom concurred BOYCE, J., dissenting:

We concur with the majority of the Court, that as an abstract proposition, the Superior Court is vested by the constitution with jurisdiction to review on *certiorari* the proceedings of

The Council in contested election cases, and when its jurisdiction over the parties thereto is shown by their interest therein, to determine by judgments of affirmance or reversal, whether the proceedings of The Council were within the jurisdiction conferred upon it by law. The other propositions of law maintained in the majority opinion of the Court, do not, however, command the assent of Judge Boyce and myself. We therefore dissent from the judgments to be entered in these cases, and consider that the magnitude of the questions involved renders that dissent of importance· sufficient to warrant a statement of the reasons and grounds upon which it is made.

Of the contentions urged by the many exceptions to the record, those which impressed the Court as of chief importance are, *first,* that the municipal election of 1909, at which both the respondents and contestants were candidates, and as a result of which the respondents were returned elected, was null and void, because the Act of Assembly purporting to authorize that election is unconstitutional, and that The Council was without jurisdiction to hear and determine a contest arising out of a void or pretended election; and *second,* that the "respondents are in possession of the offices by virtue of an election in 1907," and therefore as holding-over officers, they had such interests in the proceedings below as bring them within the jurisdiction of the Superior Court on *certiorari,* as parties with interests entitled to judgments of reversal.

A determination of the first contention requires an investigation into the constitutionality of the enactment of *Chapter* 178, *Volume* 24, *Laws of Delaware,* and the disposition of the second contention involves the statutory construction of *Chapter* 177, *Volume* 24, *Laws of Delaware.*

The latter contention, like a number of others upon which the Court has not agreed, suggests a question of the right of the respondents to the offices in contest or their interest in the proceedings arising out of the contests, either as *de facto* officers under color of an election which they claim to be void, or as holding-over officers elected in 1907 to offices with terms limited to two years. The judgments to be entered upon the majority opinion of the

Court, decide that question, and although we do not concur in that decision, we feel that its effect touches the minor issues rather than the main principle involved in these cases.    The substance of this opinion, therefore, will be limited to a reply to that of the majority of the Court, and will be confined to that phase of these cases, which, by reason of the great importance of the main question first presented, more closely affects public interests and more seriously relates to matters of public policy.

The act known as *Chapter* 177 is amendatory of the statutes relating to the City of Wilmington (*Chapter* 207, *Volume* 17, *Laws of Delaware*, as amended), and by separate sections, provides,—that at the city election to be held on the first Saturday in June, A. D. 1907, and on the same day every *fourth* year thereafter, there shall be elected twelve members of Council "for the terms of two years" and a City Treasurer, "who shall hold office for the term of two years," commencing in each instance on the first day of July next succeeding such election.

With the obvious intent to correct a manifest error in the language of this statute, which apparently provided for quadrennial elections to offices with two year terms, the General Assembly, on the same day upon which it made this enactment, passed an amendatory act, published as *Chapter* 178 of the same volume of laws, whereby it amended or attempted to amend *Chapter* 177 by striking out the word "fourth" wherever it appeared, and inserting in lieu thereof the word "second," thereby certainly providing biennial elections and making the periods of election conform to the terms of the offices.

The respondents, however, urge that *Chapter* 178 failed in its purpose to amend or otherwise disturb the provisions of *Chapter* 177 as enacted, upon the ground that *Chapter* 178 was not passed in conformity to requirements of the constitution of this State, and for that reason is illegal and altogether void.    This allegation is founded on certain entries, which it is alleged, appear upon the printed journals of the two houses of the General Assembly that enacted the statute, and upon certain inferences which have been drawn from the absence of certain entries, which it is alleged, are required by the constitution to appear upon the journals.    It is

conceded that the act published as *Chapter* 178 *of Volume* 24, *Laws of Delaware*, is a correct copy of the act that was enrolled, signed by the presiding officers of the two houses, approved by the Governor, lodged in the office of the Secretary of State and by that officer published in the session laws in accordance with the statute. Nor is it denied that the act so enrolled, signed, approved and published, was, in point of fact, passed by constitutional votes with constitutional majorities; but it is contended that the journals fail to show by affirmative entries, that the final votes upon the bill were taken by yeas and nays and fail to disclose the names of the members voting for and against the same, and for these reasons the act is unconstitutional.

By this contention the constitutionality of the enactment of the statute is challenged and the existence of the act published and asserted to be law, is put in issue. It therefore devolves upon the Court to determine, under its admitted power to inform itself with regard to the general laws of the State, to what character of evidence it will resort to ascertain and proclaim the existence and validity of laws.

In the learned discussion at the bar, it was urged on behalf of the contestants and in support of the validity of the statute, that the signing by the President of the Senate and the Speaker of the House of Representatives, of a duly enrolled bill, is an official attestation by the two houses that such bill is the one that passed the General Assembly, and that it was passed in conformity to all the requirements of law. It is a declaration by the two houses, through their presiding officers, to the Governor, that a bill thus enrolled and attested, has received, in due form of law the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that every bill which shall have passed both houses of the General Assembly shall, before it becomes a law, be presented to him. And when a bill thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed the General Assembly in the manner provided by law, is deemed complete and unimpeachable. As the Governor has no authority to approve a bill that has not been lawfully

passed, an enrolled act in the custody of the Secretary of State, and having the official attestations of the President of the Senate, of the Speaker of the House of Representatives, and of the Governor of the State, carries, on its face, a solemn assurance by the legislative and executive departments of the Government, charged, respectively, with the duty of enacting and executing the laws, that it is a law passed by the General Assembly. The respect due to these co-equal and independent departments requires the judicial department to act upon that assurance as evidence of the valid enactment of all bills so authenticated, leaving the Courts to determine, when the question properly arises, whether the act, so authenticated, is in substance a law within the limitations of the constitution. This principle is known as the enrolled act doctrine.

It is urged on the part of the respondents in the contests and against the validity of the statute, that an enrolled act, attested by the presiding officers of the two branches of the General Assembly, signed by the Governor and lodged in the office of the Secretary of State, is but *presumptive* evidence of the valid enactment of the law, and when a doubt arises or is suggested, with respect to the validity of the mode of its enactment, resort must be had to the journals of the two houses, as evidence with which to impeach and overthrow the presumption of the enrolled act. They claim that by the language of the Constitution of 1897, the entry upon the journals of yea and nay votes on the final passage of a bill, is a constitutional prerequisite to the valid enactment of the law, and therefore the constitution has made the journals of the two houses record evidence of their proceedings which is effectual to impeach and conclusively avoid acts duly enrolled, signed, approved and published, when such entries are not made. This rule is called the journal entry doctrine.

In determining by what kind of evidence the validity or invalidity of a legislative enactment is to be established, it is necessary to ascertain which of the two doctrines was contemplated by the authors of our early constitutions and what changes with respect thereto, if any, were made or intended by the framers of our present constitution.

The adoption of the first Constitution of the State of Delaware, that presented a complete arrangement of governmental powers, as distinguished from the Provisional Constitution of the Revolution, followed closely the ratification of the Federal Constitution and embraced many of its provisions, among which is the one that directs that "Each house shall keep a journal of its proceedings and publish them immediately after every session, except such parts as may require secrecy; and the yeas and nays on any question shall, at the desire of any member, be entered on the journal." (*Const. of* 1792, *Art.* 1, *Sec.* 8).

The Constitution of 1831 adopted this provision from the Constitution of 1792 in its precise language.

It would therefore seem to be beyond dispute that the provision of the Federal Constitution referred to (*Art.* 1, *Sec.* 5), is the original of the like provisions in these two State constitutions.

In England the force of an enrolled bill as conclusive evidence of the valid enactment of a law as against entries in parliamentary journals, appears to have been set at rest centuries before the adoption of the Federal Constitution (Year Books, 1307-1537) : and at the time of the adoption of that constitution, the enrolled bill was the only evidence the Courts of English speaking jurisdictions would accept for their guidance in determining the existence of a law. That in directing that journals of legislative bodies shall be kept and that entries of votes shall be made therein, the framers of these several constitutions had no intention to change the existing mode of evidencing an act by the enrolled bill, but that they had in mind a purpose altogether different, is conclusively shown by the decisions of the Supreme Court of the United States. In *Field vs. Clark*, 143 *U. S.* 649, 670, decided in 1891, Mr. Justice Harlan, in delivering the unanimous opinion of the Court, after the Court had made an exhaustive review of the authorities and digested the decisions of all the States, explained the meaning and purpose of the provision. He said "the clause of the Constitution upon which the appellants rest their contention that the act in question was never passed by Congress, is the one declaring that each house shall keep a journal

of its proceedings, and from time to time publish the same, except such parts as may in their judgment require secrecy; and the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal. (*Art.* 1, *Sec.* 5.) It was assumed in argument that the object of this clause was to make the journal the best, if not conclusive evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress. But the words used do not require such interpretation. On the contrary, as Mr. Justice Story has well said,—the object of the whole clause is to insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents. And it is founded in sound policy and deep political foresight. Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of the public measures; patriotism and integrity and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts. So long as known and open responsibility is valuable as a check or an incentive among the representatives of a free people, so long a journal of their proceedings and their votes, published in the face of the world, will continue to enjoy public favor and be demanded by public opinion." The Court held that the signing of an enrolled bill by the presiding officers of the two houses of Congress, is an official attestation by the two houses of such bill as one that has passed Congress and when the bill thus attested receives the approval of the President and is deposited in the Department of State, its authentication is complete and unimpeachable by the journal of either house showing anything to the contrary.

The meaning placed upon this provision of the constitution by the decision of *Field vs. Clark*, was expressly reaffirmed and followed with unanimous approval in *Lyons vs. Woods*, 153 *U. S.* 649 and *Haywood vs. Wentworth*, 162 *U. S.* 547.

The enrolled act doctrine was maintained in Delaware, in its full and conclusive force, under the Constitutions of 1792 and 1831, down to the time of the promulgation of the Constitu-

tion of 1897.    The question is now presented for the first time
in this State, whether the enrolled act doctrine, as contemplated
by our early constitutions, and never before questioned, was
abrogated for a new rule of evidence intended by the Constitution
of 1897.

It is provided in the present Constitution in the language of
like provisions in the early constitutions, (*Art.* 2, *Sec.* 8, 9, 10)
that a "majority of each house" or "a majority of all the members
elected to each house" "shall constitute a quorum to do business,"
that "each house may determine the rules of its proceedings,"
and that "each house shall keep a journal of its proceedings."
Prior to the existing Constitution, no further authority was
given and no further limitation was placed upon the legislative
power of the General Assembly respecting the mode of enacting
laws of a general character.    Laws were enacted by the two
houses in such manner and by such majorities as were determined
by the rules that from session to session were adopted by them.
The manner and majorities by which laws were enacted, varied
from session to session with the character of the rules adopted at
different sessions.    At one session a bill might be passed by a
majority of a constitutional quorum, which might readily be a
minority of the members of a body; at another session a majority
of all the members elected to the body might be required on a
final vote, thus making the vote so required, equal to a constitu-
tional quorum.

At one session the final vote on the passage of a bill might be
by yeas and nays, at another it might be *viva voce*, unless the
yeas and nays were demanded.

The Constitution of 1897, restricted and limited the thereto-
fore general power given the two houses to make rules for their
proceedings in the enactment of laws, by defining by express pro-
vision the method and by what majorities a bill should be passed
on final vote.    (*Art.* 2, *Sec.* 10).    This provision is as follows:

"No bill or joint resolution, except in relation to adjourn-
ment, shall pass either House unless the final vote shall have
been taken by yeas and nays, and the names of the members
voting for and against the same shall be entered on the journal,

nor without the concurrence of a majority of all the members elected to each House."

The evident purpose of this provision was to establish an open, certain and uniform method of enacting laws, and the evident meaning of the provision is that no bill shall pass unless it receive the votes, taken by yeas and nays, of a majority of all the members elected to each house.   It is, however, urged, that the purpose of the provision was to establish a new method of *evidencing* the valid enactment of laws, and that the provision means that no bill shall pass unless the vote so taken and the majority so given, are entered and shown upon the journals.   We are of opinion that such a meaning was never contemplated or intended by the framers of the constitution.   It is our opinion that the expression "and the names of the members voting for and against the same shall be entered on the journal" is nothing more than a direction to the  legislature  whereby its acts and the acts of its individual members may be made public by the journals, that the requirement does not abrogate the conclusive evidentiary character of an enrolled act, and that the expression in no sense denotes that the journals were intended thereafter to be substituted for the enrolled act as the conclusive evidence of the validity of legislative enactments.   This is our view of the effect and meaning of this constitutional provision.   I desire to add, that in arriving at this conclusion, my judgment was as much influenced by the construction and the language of the provision, as the vehicle by which a meaning or intention is conveyed, as by the authorities cited and the principles discussed.   To me it is perfectly clear, and in this I am speaking for myself alone, that the language of the provision does not say that "no bill shall pass unless the names of the members voting for and against the same shall (have been) entered on the journal," and that the language of the phrase,— "and the names of the members voting for and against the same *shall be* entered on the journal"—when taken alone or in connection with the context, does not mean that the entry in the journal of the names of those voting on a  measure, is a constitutional prerequisite to its valid enactment.   To get the meaning placed upon it by the majority of the Court, it is necessary that the language

of the provision should be changed so that it may read that "No bill * * * shall pass either house unless the final vote shall have been taken by yeas and nays, and (unless) the names of the members voting for and against the same (shall have been) entered on the journal * * * ." This however is not the language of the provision, and to get such a meaning, it is necessary for the Court to alter the language and to insert by implication the word "unless" before the phrase and to change by implication the verb and its tense. If the wording of the phrase is so changed by insertion and implication, then language is construed that is not employed in the constitution. If the wording of the provision is not so changed, then indeed, the conclusion cannot be reached from the language.

The phrase as it stands in connection with the context, unassisted and unchanged by language *aliunde*, is unobscure, and expresses without ambiguity a meaning different from that which it would express by the addition and change of words. The primary rule of statutory construction is that a statute is to receive that meaning which the ordinary reading of its language warrants. "Courts may give a sensible and reasonable interpretation to legislative expressions which are obscure; but they have no right to distort those which are clear and intelligible." (*Pearce vs. Atwood*, 13 *Mass.* 324). I admit that in the interpretation of laws, words may sometimes be inserted to make sense out of an otherwise senseless phrase, but words are never inserted to change the sense of an otherwise sensible phrase. In *Steere vs. Brownell*, 124 *Ill.* 27, the Court said, "the construction contended for cannot obtain, for the reason that it would require us, by construction, to *interpolate* * * * words not there found * * * . It is not permissible for the Court to insert words in a statute not used by the Legislature. The meaning and intent of the Legislature are to be ascertained from the words employed and we are not permitted to qualify the words of the act by arbitrarily introducing words."

In *Everett vs. Mills*, 4 *Scott.* (*N. C.*) 531, the Court said, "It is the duty of Courts to confine themselves to the words of the

Legislature—adding nothing thereto, nothing diminishing. We must not import into an act a condition or qualification which we do not find there."

In *Furey vs. Gravesend*, 104 *N. Y.* 405, the Court said, "In giving a construction to this act, Courts are confined to the language and terms employed by the Legislature, and are not at liberty to *interpolate* phrases and provisions, although otherwise the purpose and intention of the lawmaking power may seem indefinite, obscure· or incomplete."

In *Alexander vs. Worthington*, 5 *Md.* 471, the Court said, "The language of a statute is its most natural expositor, and where the language is susceptible of a sensible interpretation, it is not to be controlled by any extraneous considerations * * *. We are not at liberty to imagine an intent, and bind the letter of the act to that intent; much less can we indulge in the license of striking out and inserting, and remodeling, with the view of making the letter express an intent which the statute in its native form does not evidence."

On examination, we find that the Kentucky constitution contains a provision, similar in its nature to that of our constitution. It is as follows:—

"No bill shall become a law *unless*, on its final passage, it receives the vote of at least two-fifths of the members elected to each house, and a majority of the members voting, the vote to be taken by yeas and nays and entered on the journal." In *Lafferty vs. Huffman*, 99 *Ky.* 80; 328 *L. R. A.* 203, it was urged as in these cases, that the last phrase should be construed so as to make the entry of the vote in the journal a prerequisite to the valid enactment of the law. But the Court construed the provision in the meaning of its language, and held that the entry of a yea and nay vote was not thereby made an ingredient of the validity of an act and that journals kept under this provision could not be used to impeach an enrolled bill.

The Constitution of the State of New York (*Const. of* 1846, *Sec.* 15 *Art.* 3) provides that, "No bill shall be passed *unless* by

the assent of a majority of all the members elected to each branch of the Legislature, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered on the journal." It was urged that this provision meant that no bill shall be passed unless or except the yeas and nays be entered on the journal. But the Court declared that "the provision of the constitution requiring the question upon the final passage of a bill to be taken immediately upon its last reading, and the yeas and nays to be entered on the journal is only directory to the legislature. There is no clause declaring the act to be void if this direction is not followed. It does not stand on the same footing with the requirement of a certain number to form a quorum or to pass a bill. In the latter case there is a defect of power if the requisite number be not present and voting." (*People vs. Supervisors*, 8 *N. Y.* 317, 328).

The New Jersey constitution provides in language strikingly similar to that of our constitution, that "No bill or joint resolution shall pass *unless* there be a majority of all the members of each body personally persent and agreeing thereto, and the yeas and nays of the members voting on such final passage shall be entered on the journal." In *Pangborn vs. Young*, 32 *N. J. L.* 29, it was urged that the direction to enter the yea and nay vote constituted a prerequisite to the valid passage of a bill, but the Court held that the entry of the vote in the journal was not such a prerequisite and that a journal could not be used to overthrow the conclusive character of an enrolled bill.

The constitutional provision of the State of Delaware, relative to the entry of yea and nay votes in the journal upon the passage of legislative bills, resembles more closely, both in substance and in language, the like provisions of the constitutions of New York and New Jersey than the provisions of the constitutions of any other States. It is my opinion, that the Courts of New York and New Jersey in construing the language of the provisions of their respective constitutions, could quite as readily have interpolated into their provisions the word "unless," (with its meaning of exception or exclusion), and could quite as well

have changed the verb of the phrase from "shall be entered," (with its directory meaning), to "shall have been entered" (with its future perfect significance) as may this Court, in our provision, add the one word and change the other.

In the light of the rules of construction to which I have referred and the suggestions made in connection therewith, as well as upon the authorities cited, it is my opinion that the language of this provision justifies this analysis and compels this conclusion.   Independent of this personal view of mine, and considering the provision in all of its aspects, it is the opinion of the minority of the Court that the provision contains no expression that indicates or makes the entry in a journal of a vote on the final passage of a bill, a constitutional prerequisite to its valid enactment.

In considering the question whether the framers of our constitution intended to abrogate the enrolled act doctrine, it is recalled that in the convention that framed the constitution, there were many eminent lawyers, who by reason of their training, knew and understood the nature and quality of evidence, and there were many laymen with large experience in legislation, who, by reason thereof, knew the weakness of the systems of clerks and the fallible character of their journals. It is therefore difficult to believe that by the provision adopted, they meant to substitute a journal which is devoid of all the ordinary marks of authenticity, considered as a means of proof in a Court of law, for the record of an enrolled bill, which, in point of evidential efficiency, has no superior.   As early as 1793, the legislature, with care and wise precaution, adopted a mode of certifying its own acts in authentic form.   (*Chap.* 5, *Vol.* 2, *Laws of Delaware.*) It provided that "every law which shall have passed during the session, shall be delivered over by the speakers respectively, where the same may have originated, to the Secretary;  *   *   * that it shall be the duty of the Secretary to collate with and correct by *the original rolls*, the proof sheets of the said printed copies,   *   *   *   and to each of which volumes the Secretary shall prefix an attestation under his hand that he has collated the

laws therein contained and corrected the same *thereby.*" (*Bank vs. Wollaston*, 3 *Harr.* 90, 93.)    A like provision is contained in the Act of January 27th, 1829, (*Code of* 1829), and by the codification of 1852, it is provided that "all public statutes, when passed, duly enrolled and signed, shall be delivered by the Speaker  *  *  *  to the Secretary of State who shall forthwith have " them "accurately printed" (*Rev. Code. Ch.* 4); and by the same codification it is further provided that "The printed copies of the Acts and Resolutions of the General Assembly  *  *  *  published by authority of the State, shall be admitted as evidence thereof, in all Courts of law or equity and on all occasions whatever." · (*Rev. Code Ch.* 107, *Sec.* 5.)    By these enactments successive legislatures have required as safe-guards to their acts, the enrollment of bills by their own agencies, the signature thereto of their own chief officers, the delivery thereof by one of them to the Secretary of State, the publication by him of the bill as enrolled, and his attestation that the publication has been collated with and corrected by the original rolls, and have then declared that an act so authenticated and published is "law in all courts  *  *  *  and on all occasions whatever."    It surely cannot long be maintained that by the Constitution of 1897, its framers intended to abandon the sanctions which from early statehood, the legislature had provided for the authentication of its own acts, and to substitute therefor, entries in journals made by clerks, at their will and pleasure, without a single guarantee of their accuracy, truth or authenticity, or that they intended that thereafter the printed copies of the acts, published by authority of the State, shall be but *presumptive* "evidence thereof in all courts  *  *  *  , on all occasions whatever," and that journal entries, made without legal restriction or direction, should become the ultimate and conclusive evidence of the conformity of legislative action to constitutional provisions. ·

There. is no provision in the constitution nor is there any statute in the laws whereby clerks are required to keep their minutes and publish their journals in a manner that would show their correctness or determine their authenticity, nor is there any check upon the clerks or upon the persons printing the journals,

to prevent mistakes made by the stupid or mistatements made by the dishonest. After the adjournment of a session, a clerk is the sole custodian of his original memoranda until after their publication, and is responsible to himself alone and by himself alone he may make up, add to, take from, or otherwise change, alter or amend such a journal as he will. The best of journals is nothing more than an imperfectly indexed reproduction of printed forms hastily filled in by the clerk and by such unofficial assistants as may volunteer their aid in the hurry of a busy session. Those with experience know, that for a record that should be most certain, nothing could be more uncertain. If the validity of every act published as a law is to be tested by an examination of such a history of its enactment as the clerks may have written in the journals, then indeed there will be an amount of litigation, uncertainty and confusion appalling to contemplate. Considering the effect retrospectively, any law enacted since 1897, under which the people have lived and upon the faith of which the community has acted, involving property rights, the imprisonment of those convicted of crime, municipal franchises, bond issues, may be declared void if research disclose that the clerk of either house failed to make accurate or sufficient journal entries.

The extent to which laws may be nullified by defective journal entries, may be appreciated by a startling statement from the journal entry State of Tennessee, appearing in the latest case upon the subject in that State, in *Telegraph Co. vs. Nashville*, 118 *Tenn.* 1, 15 (1906). In considering whether the constitutional provision, that "No bill shall become a law until it shall have been signed by the respective speakers in open session, the fact of such signing to be noted in the journals," was mandatory or directory, the Court moved from its theretofore strong position on the journal entry doctrine and resorting to the presumption of the enrolled bill, held the provision to be directory. The Court said, "An opposite view and contrary holding would lead to confusion and disastrous results. * * * It appears from the certificate of the Secretary of State that the omission (in the journal) we are now considering is made in 176 Acts passed at nine sessions of the General Assembly. Many of these are the

most important laws upon our statute books. Public policy, therefore, suggests that this provision of the constitution should be held to be merely directory."

In *Sherman vs. Story*, 30 *Cal.* 253, the Court said, "Better, far better, that a provision should occasionally find its way into the statutes through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue, and impeached by the journals, loose papers of the legislature and parol evidence. Such a state of uncertainty would lead to mischief, absolute and intolerable."

Considered with respect to the administration of the law, the Court said in *Ex parte Wren*, 64 *Miss.* 532, "Every suit before every court where the validity of a statute may be called in question, will be in the nature of an appeal or writ of error or bill of review for errors apparent on the face of legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses. What is the law is to be declared by the Court. It must inform itself, as best it can what is the law. If it may go beyond the enrolled and signed bill and try its validity by the record contained in the journals, it must perform the task as often as called on." A research in one case may fail to disclose sufficient entries, and to-day a law will be declared void, while in another case, the assiduous may find other entries, and tomorrow the same law will be declared valid. Such research must be pursued by every Court, from the highest to the lowest. "A Justice of the Peace must do it, for he has as much right and is as much bound to preserve the constitution and declare and apply the law as any other Court, and we will have the spectacle of the examination of journals by Justices of the Peace" and statutes declared void by them as the result of their journalistic inquiries. On appeals, the Superior Court will be required to ascertain from the journals whether it will follow the pronouncements of the justices, and on writs of error from the Supreme Court, more excursions into the journals will have to be made to determine which of the investigations of the two lower

courts is correct. Could anything be fraught with more un-certainty?

Upon this subject, the Court said, in *Weeks vs. Smith*, 81 *Me.* 538, that : "Legislative journals are made amid confusion of the dispatch of business, and are therefore much more likely to con-tain errors than the certificates of the presiding officers are to be untrue. Moreover, public policy requires that the enrolled stat-utes of our State, fair upon their face, should not be put in ques-tion after the public had given faith to their validity. No man should be required to hunt through the journals of the legislature to determine whether a statute, properly certified by the Speaker of the House and the president of the Senate, and approved by the Governor, is a statute or not."

If in this State an enrolled act of our General Assembly, so signed and approved, no longer carries within itself conclusive evidence of the constitutionality of its own enactment, it would seem, at least in logic, that the same principle should extend to the statutes of other States when they are pleaded and are to be proved in Delaware. An act, therefore, of Illinois or Idaho, with regard to the mode of its enactment, would here be open to trial as a matter *in pais*. If this cannot be done, then it is because of the law that has maintained in this State long be-fore printed acts of other States were received as *prima facie* evidence of their authenticity, and which provides that in Dela-ware the legal mode of conclusively authenticating a statute of another State is by the seal of that State (*Kinney vs. Hosea*, 3 *Harr.* 77). If this law is not disturbed by the decisions in the cases at bar, as we surely hope it is not, then we have a situation whereby the courts of this State will accept a copy of an enrolled act of another State authenticated by the seal of that State, as the conclusive and unimpeachable evidence of the law's validity, while the same courts will receive a copy of an en-rolled act of our own State, authenticated in like manner under the seal of our own State, as *presumptive evidence* merely of the law's validity. In thus giving to the certification of a law by the seal of our own State, less evidential force than is given certifica-tions under the seals of other States, it is interesting if not perti-

nent to inquire, by what evidence, if any, may the courts conclusively declare and the public certainly know of the valid existence of a session's laws during the period of a year or more after the adjournment of the legislature, while the memoranda of the clerks are being printed into journals and before they are delivered to the State Librarian? (*Chapter* 35, *Vol.* 17, *Laws of Delaware*).

By the adoption of the journal entry doctrine as announced by a majority of this Court, the right to conclusively certify its own acts by its own solemn authentication is taken from the legislature, and its two clerks are made the sole witnesses and their journals the conclusive evidence of what the legislature did. This doctrine will make insecure the foundation of every law to be enacted, and will make it possible for one clerk, through incompetency or dishonesty, or for any person having access to his memoranda, to annul any law that is passed by the legislative and approved by the executive departments of the government. In matters of legislation involving large and conflicting interests, it places an excess of power in the hands of a subordinate officer, and makes his office one of great temptation and of limitless opportunity for fraud and corruption. Power is put into his hands to falsify or omit entries in his journal, and if corrected before adjournment, then after adjournment to expunge the correction, and annul the acts of the lawmaking departments of the government. And when a journal is made a false record, either by addition or omission, and whether it is so made before or after adjournment, as a result of either carelessness or dishonesty, there is no way known to the law to expose its frauds or to correct its errors, so as to make it show what was the real act of the legislature. (*Price vs. City*, 27 *S. E.* 218).

In *Clough vs. Curtis*, 134 *U. S.* 361, the Supreme Court of the United States sustained the Supreme Court of Idaho, in refusing relief by mandamus to compel the Clerk of the House of Representatives of Idaho, after adjournment, to restore to the journal of that body, the minutes of proceedings that he had expunged, and to expunge from the journal, minutes that he had falsified, and to include in his journal, minutes that he had omitted, and to compel

him to bring his pretended minutes and journal into court that the same might be corrected by him so as to state the facts.

Mr. Justice Harlan, in delivering the opinion of the Court said: "We are all of opinion that there was no error in denying these applications for writs of mandamus. We have not been referred to any adjudged case that would justify a court in giving the relief asked by the petitioners. And we do not suppose that such a case can be found in any State whose powers of government are distributed among separate, independent and co-ordinate departments, the legislative, the executive and the judicial. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule. It is not one of the functions of a court to make up the records of the proceedings of legislative bodies."

In the same vein, Judge Campbell, in *Ex parte Wren*, 63 *Miss.* 512, 533, treated the general theory of the journal entry doctrine. He said: "The fundamental error of any view which permits an appeal to the journals to see if the constitution has been observed in the passage by both houses of their enactments, is the assumed right of the judicial department to revise and supervise the legislative as to the manner of its performance of its constitutional functions. It is the admitted province of the courts to judge and declare if an act of the legislature violates the constitution, but the duty of the courts begins with the completed act of the legislature. It does not antedate it. The Legislature is one of the three co-ordinate departments into which the powers of government are divided by the constitution, possessing all legislative power and not subject to supervision and control during its performance of its constitutional functions, nor to judicial revision afterward of the manner in which it obeyed the constitution its members are sworn to support.

"From necessity the judicial department must judge of the conformity of legislative acts to the constitution, but what are legislative acts must be determined by what are authenticated as such according to the constitution. * * * Let the courts accept as statutes, duly enacted, such bills as are delivered by the

legislature as their acts authenticated as such in the prescribed mode. * * * Every other view *subordinates* the legislature and disregards that co-equal position in our system of the three departments of government." (*Evans vs. Browne*, 30 *Ind.* 514; *Lafferty vs. Huffman*, 99 *Ky.* 80; *Pangborn vs. Young*, 32 *N. J. L.* 29; *Field vs. Clark*, 143 *U. S.* 649.)

The conclusion of the minority of the Court is that the framers of the existing constitution, having in view principles of public policy grounded on ancient and well known rules of law, intended no change in the method of asserting and proclaiming the validity of the laws of this State, and that under the provisions of the existing constitution, an enrolled act, attested by the presiding officers of the two houses of the General Assembly, approved by the Governor, and lodged in the office of the Secretary of State is the conclusive proof of the constitutional enactment of a statute, and that an enrolled act, so attested and approved, cannot be contradicted or impeached by legislative journals. In conformity with this view is the pronounced weight of authority in those jurisdictions that derive their jurisprudence from the common law, and that have in their constitutions, provisions similar either in language or in substance to the provision in our constitution. Indeed, it has been said, "The current of the later and better reasoned authorities is unhesitatingly in favor of the doctrine that a duly enrolled statute regular on its face is conclusive of the fact that it was regularly passed." The trend of recent decisions, when of first impression, is to adopt the enrolled act doctrine, (*State vs. Jones*, 6 *Washington*, 452), and in jurisdictions where the journal entry doctrine has been adopted, the trend is to follow precedent with excuses, exceptions and modifications. (*State vs. Moore*, 37 *Neb.* 13, following *State vs. McLellan*, 18 *Neb.* 236; *Webster vs. Little Rock*, 44 *Ark.*; *Barnes vs. Starne*, 35 *Ill.* 121; *Glidewell vs. Martin*, 51 *Ark.* 559; *State vs. Francis*, 26 *Kan.* 744; *Missen vs. Canfield*, 64 *Minn.* 313; *State vs. Cahill*, 75 *Pac.* (*Wy.*) 440; *Telegraph Co. vs. Nashville*, 118 *Tenn.* 1; *In re Granger*, 56 *Neb.* 260; *Larrison vs. P. R. R. Co.*, 77 *Ill.* 11; *Wabash vs. Hughes*, 38 *Ill.* 174; *Ramsey Co. vs. Heenan*, 2 *Minn.* 281; *Coleman vs. Kelley*, 81 *Pac.* (*Kan.*) 450; *Haney vs.*

Dissenting Opinion.

State, 34 Ark. 263; State vs. Mason, 9 So. (La.) 776; People vs. Burch. 84, Mich. 408; and in some instances to overrule the doctrine in part, (Telegraph Co. vs. Nashville, 118 Tenn. 1; In re Roberts, 5 Col. 525; State vs. Mason, 55 S. W. (Mo.) 637; State vs. Mead. 71 Mo. 271; State vs. Long, 21 Mont. 26), or altogether, (Ex parte Wren, 63 Miss. 512, overruling Brady vs. West, 50 Miss. 68, Hoover vs. Chester, 39 S. C. 307, overruling State vs. Platt, 2 S. C. 150 and State vs. Haywood, 13 S. C. 46; Evans vs. Browne, 30 Ind. 514, overruling McCoullouch vs. State, 11 Ind. 424; Coburn vs. Dodd, 14 Ind. 347 and Cordell vs. State, 22 Ind. 1, and being followed by Bender vs. State, 53 Ind. 254, Western Union vs. Taggert, 141 Ill. 281 and Lewis vs. State, 148 Ind. 346).

The leading cases in support of the conclusion we have reached are Pangborn vs. Young, 32 N. J. Law, 29; Freeholders vs. Stevenson, 46 N. J. Law, 173; Lafferty vs. Huffman, 99 Ky. 80; People vs. Devlin, 33 N. Y. 269; Ex parte Wren, 63 Miss. 512; Railroad Company vs. Governor, 23 Mo. 353; Brodnax vs. Groom, 64 N. C. 244; Carr vs. Coke, 116 N. C. 223; Louisiana State Lottery Co. vs. Richoux, 23 La. Ann. 743; Usner vs. State, 8 Texas App. 177; Day Cattle Co. vs. State, 68 Texas 526; Kilgore vs. Magee, 85 Pa. St. 401; Commonwealth vs. Martin, 107 Pa. St. 185; Evans vs. Brown, 30 Ind. 514; Weeks vs. Smith, 81 Me. 538; State vs. Swift, 10 Nev. 176; Hoover vs. Chester, 39 S. C. 307; Eld vs. Gorham, 20 Conn. 8; Reed vs. Jones, 6 Wash. 452; Ritchie vs. Richards, 14 Utah, 345; Field vs. Clark, 143 U. S. 649; Lyons vs. Woods, 153 U. S. 649; Haywood vs. Wentworth, 162 U. S. 547; Sherman vs. Story, 30 Cal. 253.

By the judgments to be entered in the cases at bar upon the opinion of the majority of this Court, with which we vigorously dissent, it is now decided that journal entries constitute evidence with which to impeach and overthrow the otherwise conclusive force of an enrolled act, properly signed, approved and published, and that a journal entry doctrine prevails in this State. The validity of Chapter 178 having been attacked for want of conformity to the constitution in the mode of its enactment, it now becomes necessary to search the journals of the General Assembly of 1907, and ascertain, first the nature of the entries there found

in relation to that act, and then, to determine by which of the several kinds of journal entry doctrines the Court should be controlled in applying the test to the act's validity.

Before searching the journals, it becomes necessary to determine what constitute journals. The constitution requires that "Each House shall keep a journal of its proceedings and publish *the same* immediately after every session." (*Const. Art.* 2, *Sec.* 10). This provision seems to contemplate two things, the keeping of a journal and the publication of the journal so kept, thereby indicating two things, an original and a publication or printed copy of the original. In providing archives for public records, *Chapter* 35 *of Vol.* 17, *Laws of Delaware*, enacted in 1883, directs that the Secretary of State "shall deliver to the State Librarian all copies of *original journals* that may be now in said room, to be by him placed in the State Library," and that "it shall be the duty of the said Secretary (of the Senate) and the said clerk (of the House), so soon as their respective journals have been published, to deliver the *originals* to the State Librarian to be by him placed in the State Library." By this statute especial provision is made for the custody of "original journals," or "originals," as distinguished from the printed copies thereof. There appears, therefore to be two kinds of journals, "originals" and "publications." To which are we to resort? Journals of neither kind were introduced in evidence below, while here, only the printed journals were offered as evidence of which the Court was asked to take judicial notice. There is no law which requires the published copy to be certified, and therefore in the absence of the original, there is nothing to show that a printed journal has been "collated with and corrected by" the original, as required in publishing statutes, or that it is a correct reproduction of the original. The printed copy being thus without certification or other evidence of its correctness or even of its authenticity, and there being no law which gives to it the force of primary evidence, we think the ordinary rules of evidence should be applied to the cases at bar and if judicial notice is to be taken of any journals, it should be of originals instead of unauthenticated copies.

As the original journals of the session of 1907 were introduced in evidence, neither here nor below, it is apparent, that in reaching their conclusion, the majority members of the Court took judicial notice of the contents of the printed copies. Research of those printed copies, therefore, must now be made to ascertain what they disclose.

The entries of the journals of the two houses, when digested, suggest the history of the act published as *Chapter* 178, *Volume* 24, *Laws of Delaware.* From these entries it appears, that Mr. Sparks introduced a bill in the Senate, entitled "An Act to amend *Section* 31, *Chapter* 207, *Volume* 17, *Laws of Delaware,* being an Act entitled "An Act to revise and consolidate the statutes relating to the City of Wilmington," by providing that "The Council" of the Mayor and Council of Wilmington shall have power and authority to amend, revise or repeal the charter of the said The Mayor and Council of Wilmington." This bill was given the designation of S. B. No. 142, read the first and second time, "and *referred to* the Committee on Cities and Towns."

By the next entry it appears, that "Mr Sparks, on behalf of the Committee on Cities and Towns, *to whom had been referred* the bill (Senate Substitute for S. B. 142,) entitled, "An Act to amend an act entitled "An Act to alter and re-establish the statutes relating to the City of Wilmington," passed at Dover, March 15th, 1907, by providing when city officers of the City of Wilmington, shall be elected and appointed, reported *the same* back to the Senate favorably." (It is important here to note, that *Senate Substitute* for S. B. No. 142, so mentioned for the first time, so entitled, and so reported back, is the bill that was enrolled, signed, approved and published). On the same day and on the page of the journal next following that upon which is the preceding entry. appears an entry that "On motion of Mr. Sparks, the bill, (S. B. 142), entitled (as in the original) was taken up," read the third time, passed by a yea and nay vote with the names of those voting for the same entered on the journal, and "ordered to the House for concurrence."

The House journal entries show that "Senate Bill, No. 142, entitled" (as in the original) was presented to the House, read the

several times and passed by a yea and nay vote showing the names of those voting for the same, and "ordered that the Senate be informed thereof and the bill returned to that body." The Senate journal then shows, that Mr. Swain, Clerk of the House, informed the Senate that the House had concurred in "S. B. No. 142, entitled" (as in the original).

The next entry in the Senate journal is that "Mr. Iliffe, on behalf of the Committee on Enrolled Bills, reported as duly and correctly enrolled and ready for the signature of the President, the following Senate Bills: S. B. No. 142, entitled" (*as in the substitute*). The House journal then shows that "Mr. Evans on behalf of the Committee on Enrolled Bills reported as duly and correctly enrolled and ready for the signature of the Speaker, the following bills: * * * Also Senate Bill, No. 142, entitled" (*as in the substitute*). "Mr. Sterner, Clerk of the Senate, presented for the signature of the Speaker of the House, the following duly and correctly enrolled Senate bills, the same having been signed by the President of the Senate; also Senate Bill, No. 142, entitled" (*as in the substitute*), and lastly the Senate journal shows that "Mr. Swain, Clerk of the House, returned the following duly and correctly enrolled Senate bills, the same having been signed by the Speaker of the House and Mr. President of the Senate; S. B. 142, entitled" (*as in the substitute*).

From these entries it appears that two bills bearing the same number with different titles were introduced in the Senate and that one of these bills passed both bodies in a constitutional manner [by constitutional majorities. The entries show that the Clerks entered in their journals the yea and nay votes under the title of the original bill, as though that were the one voted upon, while the entries further show that the enrolling committees of the two houses reported the substitute bill by its substitute title and the presiding officers signed the enrollment thereof as the bill that had passed their houses, (Rules of General Assembly of 1907; *Ramsey Co. vs. Heenan*, 2 *Min.* 281), and as a necessary inference as the one that had received the votes. The journal entries therefore offer the acts of the clerks, of the two enrolling

committees and of the presiding officers of the two houses as facts from which to deduce a conclusion.

The journals, therefore, as evidential records of what in fact transpired are naturally quite imperfect, and first, suggest a doubt as to the correctness of their entries, and as to an affirmative showing of a non-compliance with constitutional requirements in enacting the bill, and second, raise a question of identity as to which of the two bills did in fact receive the votes recorded. To determine the effect of such a doubt and to solve such a question of identity, resort must be had to authorities in those jurisdictions that have adopted journal entry doctrines.

The journal entry doctrine had its origin in the State of Illinois, (*Spanger vs. Jacoby*, 14 *Ill.* 297), and was founded on a change in the constitution of that State which was held to make the rule proper.    As formulated in *Barnes vs. Starnes*, 35 *Ill.* 121, the doctrine in its purity is, that "when a bill has become a law, there must be record evidence of every material requirement from its introduction until it becomes a law.    And this evidence is found upon the journals of the two houses," or that unless the journals affirmatively show conformity to all of the requirements of the constitution in the progress of a bill through its several stages, the enactment is invalid.    This is the contention urged in the cases at bar and accepted by the majority of the Court.    With respect to this view, the Court said in *Ex parte Wren* (*supra*) that it "has but feeble support.    Its absurdity is so manifest as to have found few advocates.    It degrades the legislature below the level of an inferior court of special and limited jurisdiction, and demands that its daily record of its proceedings shall affirmatively show the existence of all those facts and conditions on which its power to act depends, and indulges no presumption in favor of its proper action, even as to matters over which its power to act is undoubted.    *   *   *   It is evident that able judges in Illinois have been dissatisfied with this rule.    In the case just mentioned, (*Barnes vs. Starnes*, 35 *Ill.* 121), it is said—Were it not for the peculiar provision of our constitution, which requires that all bills, before they can become laws, shall be read three several times in each house, and shall be passed by a vote of a majority

of all the members elect, a bill thus signed and approved would be conclusive of its validity and binding force as law.—It was also said—We are not however prepared to say, that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard or to become responsible for its neglect."

A dozen or more states adopted the original of the Illinois journal entry doctrine, and as soon as they adopted it, they sought means to escape from its evils. The result is that in different jurisdictions there are divergent doctrines. Few journal entry jurisdictions now hold rigidly that a law's validity depends upon the journals showing affirmatively a compliance with all constitutional requirements. On the contrary, the most of them now put the rule negatively, and hold that a law's invalidity is established only when the journals affirmatively and positively show a non-compliance with constitutional requirements, and that there is a "presumption" in favor of the constitutional enactment of the enrolled bill, which prevails when the journals are either silent or suggest a doubt with respect to the mode of enactment. On the other hand some journal entry jurisdictions do not consider the journals to be the only evidence of the manner of a law's enactment, but when the journals are ambiguous or uncertain, go beyond them and examine other evidence to aid them in arriving at a conclusion as to what was the action of the legislature.

In harmony with the first modified view, Kansas, which is one of the leading journal entry States, holds that "The enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity unless the journals of the legislature show clearly, conclusively and *beyond all doubt* that the act was *not* passed regularly and legally. If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, *then it is the duty of the Court to hold that the enrolled statute is valid.*" *(State vs. Francis, 26 Kan.* 744, followed later *In re Taylor, 55*

*Pac.* 340, and by *State vs. Andrews*, 67 *Pac.* 870; *Homrighausen vs. Knoche*, 50 *Pac.* 879; *Chesney vs. McClintock*, 58 *Pac.* 993).

Minnesota holds, that "It is also well settled *everywhere* that the presumption that an enrolled bill, duly authenticated was constitutionally passed, is very strong, and that, even where that presumption is rebuttable by reference to the journals, the evidence must be very strong and clear in order to overcome this presumption, and that the courts will give to the entries in the journals the reasonable construction most favorable to the validity of the act." (*Miesen vs. Canfield*, 64 *Minn.* 313).

Wyoming holds, that it is always a matter of very grave importance to decide upon the constitutionality of an act of the legislature, and a statute should be held void only where it is shown that there has been a clear violation of the Constitution. Where there is any doubt it is to be resolved in favor of the will. (*State vs. Cahill*, 75 *Pac.* 440.)

Tennessee holds to this modified doctrine. In the case of *State vs. Algood*, 87 *Tenn.* 163, the Senate journal showed that the statute in question had been rejected in the Senate, and that a motion to reconsider had been entered; and though there was *no record of any action on the motion to reconsider*, the Court held that the act would be presumed to have been regularly called up and favorably acted upon. The Court said: "We think the rule well settled that, when the journal does not affirmatively show the defeat of the bill, every reasonable presumption and *inference* will be indulged in favor of the regularity of the passage of an act subsequently signed in open session by the speaker." This case was cited with approval in *Telegraph Co. vs. Nashville*, 118 *Tenn.* 1, and in *Nelson vs. Haywood Co.*, 91 *Tenn.* 596, which latter case it is interesting to note also cited *Field vs. Clark* (*supra*).

The journal entry States of Nebraska (*In re Granger*, 56 *Neb.* 260; *State vs. Frank*, 60 *Neb.* 327) and Alabama (121 *Ala.* 28) also adhere to this phase of the doctrine. Illinois, the author of the doctrine, has likewise receded from the position it first assumed, and has sought to modify its doctrine and to ameliorate its operation by declaring that, "If we find a law signed by the Speakers of both houses and approved by the Governor, we must

presume that it has passed in conformity to all the requirements of the constitution, and is valid, until the presumption is overcome by legitimate proof.    And in such a case, the evidence must be .clear and convincing.    It is by no means sufficient to only create a doubt whether the requirements of the organic law have been observed, but it must be clearly proved." (*I. G. R. R. vs. Wren*, 43 *Ill.* 77, followed in *Hensoldt vs. Town*, 63 *Ill.* 157, and *Larrison vs. Peoria R. R. Co.* 77 *Ill.*, 11).

Having in mind this rule of the modified doctrine, an examination of the journal entries offered in the cases at bar, shows that the votes on S. B. No. 142 were recorded under an entry referring to a bill by that number but by a title different from that which was enrolled and published as *Chapter* 178.    Further examination shows that the enrolling committees of the two houses, which according to Rule 5 of the General Assembly of 1907, are required to examine the bill as enrolled, "with the original, *as passed by both Houses*" and correct and report the same, received an enrollment, made by the Clerk of the Senate, of a bill designated S. B. No. 142, but bearing the title and containing the substance of Senate Substitute for S. B. No. 142, which, if they performed their duty, and this we have a right to assume, was compared by them "with the original, *as passed by both Houses*," (*Ramsey Co. vs. Heenan*, 2 *Minn.* 281), and was reported to their respective bodies, where it was signed by the presiding officers, and then approved by the Governor, and published as *Chapter* 178.

Considering these entries together, we are of opinion that they show that the "original, as passed by both Houses," and as afterward signed by the speakers and approved by the Governor, was Senate Substitute for S. B. No. 142, and that by them the journals show the votes to have been taken on the substitute, and that the entry of the votes under a bill designated by the same number with a different title, was a clerical mistake. (*I. C. R. R. Co. vs. People*, 143 *Ill.* 434; *O'Hara vs. State*, 121 *Ala.* 28; *Larrison vs. Peoria R. R. Co.*, 77 *Ill.* 11; *Walnut vs. Wade*, 103 *U. S.* 683.) As in this conclusion the Court is not unanimous, then can there be any question that the entries at least present a record of such doubt, uncertainty and ambiguity as to invoke the  rule

previously cited upholding the statute on the "presumption" of the constitutional enactment of the bill as enrolled?

Eliminating from our examination of the journal entries offered in these cases our personal knowledge of legislative routine, which of course is not evidence and should have no bearing or influence upon a consideration of the question, and confining our examination to the entries exactly as they appear in the journals, which are urged and are now declared to be the sole evidence of the manner of the law's enactment, we are convinced that the entries do not even present such silence, doubt or ambiguity as to necessitate recourse to the enrolled act "presumption" of the modified journal entry doctrine just referred to, in order to uphold the validity of this law's enactment, but on the contrary, that the entries affirmatively show by positive expression, within the meaning of the original rule, that the act was passed in compliance with all constitutional requirements and that the votes by yeas and nays entered upon the journals were taken upon the Senate Substitute which was signed, approved and published as law.

The Senate journal shows (p. 592) that "On motion of Mr. Sparks, the bill, (S. B. No. 142) entitled (as in the original), was read a first time, * * * and further on his motion the bill was read a second time, by its title, and referred to the Committee on Cities and Towns." This entry shows that the original Senate Bill No. 142 was put into committee. The next entry is, (p. 811), that "Mr. Sparks, on behalf of the Committee on Cities and Towns, to whom *had been* referred the bill (*Senate Substitute* for S. B. No. 142), entitled (as in the substitute), reported *the same* back to the Senate favorably." This entry shows that the Senate Substitute, at some time and in some manner not discoverable in the Clerk's journal, had been presented to the Senate and by the Senate "had been" referred to the Committee on Cities and Towns. There then appeared to be two bills with the same number and different titles introduced into the Senate and referred to the same committee. The last entry further shows that the committee reported one of these bills back to the Senate favorably and that bill was "*Senate Substitute* for S. B. No. 142."

Upon the same day upon which the Senate Substitute was so reported back to the Senate and presumably within a few minutes thereafter, it appears by entries on the very next pages (812, 813), that a vote was taken upon a Senate bill numbered 142, though by the title of the first bill referred to committee and not shown ever to have been reported out of committee. There having been two bills with the same number put into committee and but one bill with that number reported out of committee, and a bill with that number having been put upon its passage almost instantly after the bill so numbered was reported out, as shown by the sequence of the entries in the journal, it is a necessary and irresistible inference that the bill voted upon, by yeas and nays, and recorded in the journal, was the Senate Substitute that had just been reported out of committee and sent upon its passage through the two houses. There is nothing in the journal anywhere to show that the original bill after it got into committee ever got out, while the journal shows that the Substitute after it got into committee did get out, and just as soon as it got out, a vote was taken upon a bill with its number. It will not do to say, that the constitution does not require journal entries of Committee reports, that the original bill might have been reported out and the clerk might have failed to make an entry of it in his journal, and therefore two bills instead of one might have been before the bodies, and the vote might have been taken on the original. If clerks are hereafter to be the sole arbiters of what shall be the substance of the evidence of the validity of our laws, they must record the whole history of acts, and if in failing so to do, they fail to show a law to be invalid; surely no one will hold that the courts will presume that the clerks omitted something, which, if inserted, would destroy a law's validity. On the contrary, it is unnecessary to cite authority that courts must always resolve every presumption and employ every intendment in support of the validity of law. The journals show but one Senate bill numbered 142 before the houses at the time the votes were taken and entered in the journals, and that bill was the Senate Substitute, afterward enrolled, signed, approved and published as law. In thus determining the identity of a bill enacted

Dissenting Opinion.

into law, where there is a uniformity of numbers and a confusion of titles, the argument here made is strongly supported by three of the leading cases arising in the journal entry jurisdiction of Illinois. These cases are *Larrison vs. Peoria &c. R. R. Co* 77 *Ill.* 11, and *Walnut vs. Wade*, 103, *U. S.* 683; and *I. C. R. R. Co. vs. People*, 143 *Ill.* 434.

The journal entry doctrine urged by the respondents and adopted by this Court, as shown in its majority opinion, is a doctrine that has never been adopted by some journal entry jurisdictions and has been modified or abandoned by many that at first adopted it. It is that "the journal is made not only the *first*, but the *only* evidence permissible to establish the fact that a bill has received an yea and nay vote, entered on the journal    *    *    *    That any attempt to impeach the journal or to *explain* it is precluded.    *    *    *    That being records, they speak absolute verity," and therefore the courts cannot go behind or beyond the journals for evidence of the enactment of a law. Such a doctrine prevails scarcely anywhere. As before suggested, when states that have adopted the journal entry doctrine as promulgated by Illinois, became aware of its consequences, they, together with Illinois, proceeded to modify its operation. Some jurisdictions recognized a presumption in favor of the validity of the enrolled bill, when the journals were silent or presented a doubt or were ambiguous in their meaning. Others modified their rule by going beyond both the journals and the enrolled bill in search for other evidence. Illinois was among the first to break away from its own doctrine, and in *Wabash R. R. Co. vs. Hughes*, 38 *Ill.* 174, the Court said, "Whether bills have or not become laws, can only be known from the evidence which the journals and *the original bill with its endorsements afford*." (*Ottowa vs. Perkins*, 94 *U. S.* 260; *Walnut vs. Wade*, 103 *U. S.* 683).

In Minnesota it was held (*Ramsey County vs. Heenan*, 2 *Minn.* 281) that "The Courts may have recourse to legislative proceedings, *rules*,    *    *    *    and original bills on file with the Secretary of State,    *    *    *    to ascertain whether or not the law has received all the constitutional sanctions to its validity."

Dissenting Opinion.

In Kansas, it was held in *Topeka vs. Gillett*, 4 *Pac*. 800, and followed in *Coleman vs. Kelley*, 81 *Pac*. 450, that in construing or passing upon the constitutionality of an act, the Courts "will take judicial notice of what the books published as laws contain, of what the enrolled bills contain, of what the Legislative Journals contain, and indeed, of *everything*, that is allowed to affect the validity or meaning of any law in *any* respect whatever."

Other journal entry states that go beyond the journals for evidence are Arkansas (*Haney vs. State*, 34 *Ark*. 263,) Louisiana (*State vs. Mason*, 9 *So*. 776), Maryland (*Berry vs. R. R. Co.*, 41 *Md*. 446; *Legg vs. Annapolis*, 42 *Md*. 203; *Strauss vs. Heiss*, 48 *Md*. 292), Michigan (*People vs. Burch*, 84 *Mich*. 408) and Nebraska (*State vs. McLelland*, 25 *N. W.* 77, 79; *In re Groff*, 33 *N. W.* 426; *State vs. Moore*, 37 *Neb*. 13; *Simpson vs. Union Co.* 110 *Fed*. 799).

While these jurisdictions permit the journals to control and impeach the enrolled act, they do not hold that they "speak absolute verity" and that any "explanation" of their entries "is precluded" as decided in the cases at bar, but extend to the Court the right and impose upon the Court the duty to seek further for such evidence as will throw light on what the legislature did. Any other rule binds the Court to known errors of the journal, and compels the Court to declare that to be void which it may know to be valid. If the rule as modified by these last named jurisdictions were to be followed in Delaware, then as in this instance, it is possible in a measure to check the acts and discover the errors of clerks, and to correct to a degree the natural weakness of the doctrine. If this modified rule were adopted in this State, and the original records of the General Assembly of 1907 were examined in connection with the journals, there would be an end to the cases at bar, for these records show that the bill known as Senate Substitute for S. B. No. 142 was the bill that received the yea and nay votes of the two bodies, entered in the journals, and was the bill that was enrolled, signed, approved and published. The respondents do not deny that the Senate Substitute was in fact passed by lawful majorities with yea and nay votes, but urge that the journals do not record this fact,

Dissenting Opinion.

and therefore the Court should declare void a law which other and better records show to be valid.

It has been suggested that recourse may not be had to the original records of the General Assembly of 1907, as evidence by which to determine the identity of the bill passed, as they were not introduced in evidence, and as a consequence we should shut our eyes to what they disclose.

If this proposition be sound, then recourse should not be had to the journals of the General Assembly of 1907, as they were neither introduced in evidence nor their contents mentioned in the contest below, and of course they were not introduced in evidence in the review on *certiorari*.

As the journals do not appear as evidence in the record, and as evidence not essential to the completion thereof, cannot be introduced in a proceeding on *certiorari*, which in this State is a proceeding of review for errors apparent upon the face of the record, the majority of the Court in giving to the journals the consideration shown by their opinion, ignored a line of decisions of certain journal entry jurisdictions, which hold that it is not the province of the Court at the suggestion or request of counsel to undertake to explore the journals for the purpose of ascertaining the manner in which a law, duly certified, went through the legislature and into the hands of the Governor, and that "if counsel say the journal shows a law to have been passed without calling the yeas and nays, let them make the requisite proof of that fact by means of the legislative journals and *introduce the proof into the record*." *Illinois Central R. R. Co. vs. Wren*, 43 *Ill.* 79; *Grob. vs. Cushman*, 45 *Ill.* 119; *Marean vs. Stanley*, 39 *Pac.* 1086; *Sargeant vs. La Platt Co.* 40 *Pac.* 366; *Rice vs. Carmichael*, 34 *Pac.* 1010; *Zang vs. Wyant*, 56 *Pac.* 564; *Clearwater Bank vs. Kurkonski*, 65 *N. W.* 133; *Bradley vs. West*, 60 *Mo.* 33.

As no such proof was made of the journals in the cases at bar, the majority of the Court must have taken judicial notice of the contents of the journals, and if the Court may take judicial notice of journals, which are but printed *copies* of the clerks' originals, it may be held, certainly with equal force, that the

Court may take judicial notice of the acts of the legislature shown by its *original* records.

These original legislative records were produced in the cases at bar, by the process of the Superior Court and shown to this Court. They are the original bills with their original endorsements, and two sets of RECORDS, one set kept by the Clerks and the other set kept by the presiding officers of the two houses. These records are supplied to the officers of the two bodies by the State as a part of their paraphernalia, and each legislative act is intended to be recorded therein. These records are books, the printed pages of which contain such forms as experience has shown to be adapted to recording the acts of the bodies, and their acts and doings are inserted by pen and ink in the blanks of the printed forms. The forms as printed in the two sets of records are substantially the same, and indicate that one record might operate as a check upon the other. From the Clerks' records, the minutes of the daily proceedings are read, but these records are not the Clerks' journals, for their journal memoranda are kept on and made up of loose sheets of printed forms. The Speakers' records are used by them in conducting the business of their bodies.

The Record of the Clerk of the Senate shows that in the title blank, there is entered "S. B. No. 142. Title of Bill, An Act &c. (title of original bill) * * * 3-4 1907, read 2d time and referred to Committee on C. & T. 3-18 1907, Reported by *Senate Sub*. 3-18 1907, Read 3d time and passed."

The Record of the President of the Senate shows that in the title blank, there is entered "S. B. No. 142. Title of Bill, An Act &c. (title of original bill) * * * Mar. 4, 1907, Read 2d time and referred to Committe on C. & T. Mar. 18, 1907, Reported Favorably *by substitute*. Mar. 18, 1907, Read 3d time and passed."

From these records it appears that the bill originally introduced was reported "by substitute," and being so reported can anyone doubt that the vote in the Senate and recorded in the journal was taken on the substitute so reported?

The Record of the Clerk of the House shows that in the title blank there is entered "S. B. No. 142. Title of Bill *Senate Substitute for* Senate Bill No. 142 entitled An Act &c. (as in original). 3–18 1907, Presented for concurrence, * * * 3–18 1907, Read 2d time and referred to Committee on M. C. 3–18 1907, Reported Favorably. 3–18 1907, Read 3d time Passed. 1907 Presented Enrolled. 1907 Reported Enrolled, signed and returned."

The Record of the Speaker of the House shows in the title blank, there is entered "S. B. No. 142 *Senate Substitute*. Title of Bill An Act &c. (as in original) 3–18 1907, Presented for concurrence. * * * 3–18 1907, Read 2d time and referred to Committee on Municipal Corporations. 3–18 1907, Reported favorably. 3–18 1907 Read 3d time 3–18 *Senate Substitute*, adopted. 3–25 1907, Presented Enrolled. 3–25 1907, Reported Enrolled, signed and returned."

The House records show that the bill presented to it "for concurrence" was the *Senate Substitute* without mention of the original bill except to show for what it was a substitute. Can there be any doubt upon what the vote in the House was taken? As no one has ever claimed that both bills were voted upon, is it not certain that the yea and nay votes on S. B. No. 142 entered on the journal, were taken upon the substitute for that bill?

The record entries showing the final acts of the bodies with respect to the enactment of the Substitute, appears in the Record of the Clerk of the Senate as follows. "1907, Returned from House Concurred in. 3–25 1907, Reported enrolled. 3–25 1907, Signed by President and delivered to House. 3–25 1907 Returned, signed by President of the Senate and Speaker of the House. 3–25 1907, Delivered to the Governor."

As it is admitted that the Governor signed the Senate Substitute as enrolled, these entries show that the bill "concurred in" by the House was the Substitute.

The endorsements upon the original bill and upon the Senate Substitute, are made partially by the impress of what appears to be a rubber stamp and partially in writing.

The endorsements on the original bill are "No. 142. Sparks. An Act to amend &c. (as in original), Read 1st time 3–4–07; Read 2nd time 3–4–07. Referred to Committee on C. and T. Reported favorably by *Sen. Sub.* Read 3rd time and passed the Senate 3–18–07," Signed, "L. G. STERNER, *Clerk of the Senate.*"

The next entries on the original bill show the same stamped form with but one blank filled, which is "3–8" after the words "Read 1st time." This form, intended for use in the House, has no further entries made in its blanks and is not signed by the Clerk of the House, and therefore its printed wording is without force.

The endorsements on the Senate Substitute for Senate Bill No. 142 are as follows:

"Senate Substitute for Senate Bill No. 142.
Read 1st time........................
Read 2nd time. .................................
Referred to Committee
On ...................................
Reported........favorably............
Read 3rd time and........passed......
the Senate 3–18–07

L. G. STERNER, *Clerk of the Senate.*

Read 1st time........................
Read 2nd time ......................
Referred to Committee
On ...................................
Reported........favorably............
Read 3rd time and........ passed......
the House 3–18–1907.

W. J. SWAIN, *Clerk of the House.*"

Upon the uncontested facts shown by the legislative records as well as upon the principles presented in this opinion, it is the conviction of the minority members of the Court that Senate Substitute for Senate Bill No. 142 was constitutionally enacted,

Decree of Court in Banc.

that *Chapter* 178 *of Volume* 24, *Laws of Delaware*, is a valid law, and that the election held in the City of Wilmington on the fifth day of June A. D. 1909, under and by force of its authority, was a valid election.

On the same day, the opinion of the Court in Banc having been certified to the Superior Court, the said Superior Court being then in session, entered the following decree in each of said cases, to-wit:

And Now to-wit, this seventh day of June, A. D. 1910, the opinion of the Court in Banc having been duly certified to this Court, in accordance therewith it is now Ordered, Adjudged and Decreed by this Court, that the judgment below be reversed, and that the respondent below have execution for his costs.

JAMES PENNEWILL, C. J.